IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

RICHARD BRAUN, et al.,

        Plaintiffs,

      v.                                    Case No. 23-cv-234

MARTIN J. WALSH, in his official
capacity as Secretary of Labor,

        Defendant.

## PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER

### INTRODUCTION

For nearly fifty years, Americans of varying races, career paths, and political stripes have relied upon the Employee Retirement Income Security Act of 1974 (ERISA) to protect the integrity of their retirement income. While the workers come from all walks of life, ERISA's purpose—to ensure that proceeds set aside for retirement are prudently invested for their benefit—unites them all. Or at least that was the case until the Department of Labor's latest rulemaking on prudence in investing, which turns the concept of fiduciary duty on its head.

The law prohibits plan administrators and fiduciaries from defrauding retirees, from investing in securities in which the fiduciary or administrator has a conflict of interest, and from prioritizing policy preferences over financial returns. ERISA requires that fiduciaries

and administrators act "solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1).

On December 1, 2022, the Secretary of Labor promulgated a rule that fundamentally alters the relationship between fiduciaries and participants in that it would authorize decisions that are not "solely in the interest of the participants and beneficiaries" of ERISA plans (the "ESG Rule"). (Declaration of Katherine D. Spitz, Ex. 1.) The ESG Rule would allow those making investment decisions to take into account unquantifiable policy choices favored by the current administration related to climate change, board governance, employee diversity and equity initiatives, and other so-called "environmental, social, and governance" or "ESG" issues by defining these factors as appropriate "risk-return" factors. This is an impermissible and irresponsible attempt at social engineering that erodes the foundation upon which ERISA is built and could cost plan participants nationwide many millions of dollars.

## FACTS

*Purpose of ERISA*

Congress enacted ERISA in 1974 "owing to the lack of employee information and adequate safeguards concerning the[] operation" of retirement plans. 29 U.S.C. § 1001(a). The statute was passed to provide disclosures and safeguards to retirees concerning their retirement plans. *Id.* ERISA plans cover approximately 141 million workers and beneficiaries in the United States; by comparison, the United States' total workforce

comprises roughly 264 million people,[1] meaning that roughly half of the American workforce is impacted by ERISA and the regulations promulgated pursuant to its authority. ERISA plans provide significant tax advantages to both the employer and employee in an effort to encourage retirement savings. 29 U.S.C. § 1001(a) (noting that retirement plans subject to ERISA are "afforded preferential Federal tax treatment" and establishing "minimum standards" "assuring the equitable character of such plans and their financial soundness"); 26 U.S.C. § 401 *et seq.* (describing conditions of qualified retirement plans).[2]

ERISA exists to protect retirement savings from mismanagement and abuse, and the statute imposes strict fiduciary duties on those who administer the plans. Plan administrators are required to administer ERISA plans under a duty of prudence and a duty of loyalty. The duty of prudence requires fiduciaries to act with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims. 29 U.S.C. § 1104(a)(1)(B). The fiduciary is also under an obligation to diversify the retirement plan's assets "so as to minimize the risk of large losses." 29 U.S.C. § 1104(a)(1)(C).

*Environmental, Social, and Governance Factors and Investing*

---

[1] Bureau of Labor Statistics, https://www.bls.gov/news.release/empsit.t01.htm (last visited October 27, 2022).

[2] *See also* U.S. Dep't of Labor, *FAQs about Retirement Plans and ERISA*, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/faqs/retirement-plans-and-erisa-for-workers.pdf (generally describing use of pretax deductions and contributions by employers on a "tax-favored basis").

In recent years, an investing fad often referred to as "ESG," which by its nature focuses on environmental, social, and governance goals, has come into vogue. According to the Biden administration, ESG can also be referred to as "sustainable investing, socially responsible investing, and impact investing." But the facts have demonstrated that investing with these aims does not maximize the return on investment. While retirement plans across the board took a hit in 2022, ESG funds were hit harder than most.[3] And the costs of administering ESG portfolios tend to be higher than other funds, also affecting participants' retirement accounts.[4] Whatever euphemism one wishes to use—"people over profits," "standing for something more," etc.—the ESG investment trend contemplates a focus on policy objectives rather than financial returns. This ERISA forbids.

On December 1, 2022, the Secretary promulgated a new rule, *Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights*, 87 Fed. Reg. 73822, 73884 (hereafter the "ESG Rule"), which both permits and encourages plan administrators to consider ESG factors when making investments on behalf of plan beneficiaries. The ESG Rule stems from a broader executive initiative, outlined in Executive Order 14030, which aims to fight climate change through rulemaking across federal agencies, from the Securities and Exchange Commission to the Department of Education.

The ESG Rule replaces a regulation, promulgated in 2020, that expressly permitted fiduciaries to consider ESG factors under some circumstances while affording plan

---

3 See, e.g., Thomas Catenacci, Massive green energy company reports nearly $1 billion in losses, calls for 'further governmental action', (Feb. 2, 2023), available at https://www.foxnews.com/politics/massive-green-energy-company-reports-1-billion-losses-calls-further-governmental-action

4 Michael Pollock, *Why It's So Hard to be an ESG Investor*, Wall Street Journal (Feb. 4, 2023).

participants and beneficiaries certain procedural safeguards. (Spitz Decl. Ex. 2.) Under the 2020 rule, ESG factors may be considered when making investment decisions only where the fiduciary is "choosing between or among investment alternatives that the plan fiduciary is unable to distinguish on the basis of pecuniary factors alone," and if the decision comes down to ESG factors the decisionmaker must document "how the chosen [ESG] factors are consistent with the interests of participants and beneficiaries in their retirement income or financial benefits under the plan," among other things. (Ex. 2 at 72884.) The 2020 rule was explicit that investment decisions "may not subordinate the interests of the participants and beneficiaries in their retirement income" "to other objectives, and may not sacrifice investment return or take on additional investment risk to promote non-pecuniary benefits or goals." *Id.*

The ESG Rule eliminates these protections. Instead of placing financial interests first and using non-financial interests as a bonus or a tiebreaker, the new rule purports to redefine the concept of fiduciary duty by simply decreeing that "Risk and return factors may include the economic effects of climate change and other environmental, social, or governance factors on the particular investment or investment course of action." (Ex. 1 at 73885.) For clarity, these factors are the only ones listed in the regulation; other traditional considerations (such as stock price and performance) are not mentioned. The ESG Rule dispenses entirely with the requirement that the reasons for the reliance on ESG be documented. The Biden administration's reasoning for doing so is that providing this information would create a "red flag" for potential litigants—in other words, to

- 5 -

Case 2:23-cv-00234-PP   Filed 02/28/23   Page 5 of 30   Document 8

disadvantage workers who might seek to vindicate their rights under ERISA, or who might otherwise disagree with the decision to politicize retirement plans. (*Id.* at 73838.)

Plaintiffs are participants in retirement plans governed by ERISA through their employers. (Dkt. 1, ¶¶ 12-13.) Plaintiffs seek a declaration that the ESG Rule exceeds the authority of and is inconsistent with the duly enacted text of ERISA and an injunction preventing the ESG Rule from going into effect.

## ARGUMENT

### I.    Standard of Review, Basis of Jurisdiction, and Standing

To obtain a preliminary injunction, a party must establish that he or she 1) is likely to succeed on the merits of the claim; 2) is likely to suffer irreparable harm in the absence of preliminary relief; and 3) legal remedies are inadequate. *Cook Cty., Ill. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020); *see also Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015). If the moving party makes this showing, the court balances the harms to the movant, the non-movant, and the public. *Id.* (citation omitted). The standard is the same as that of an application for a stay under section 705 of the APA. *Wolf,* 962 F.3d at 221 (citing *Cronin v. U.S. Dep't of Agric.*, 919 F.2d 439, 446 (7th Cir. 1990)).

Plaintiffs also seek a temporary restraining order pending the full briefing of their motion for preliminary injunction. The purpose of a temporary restraining order is to maintain the status quo pending a hearing on the merits. *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1330 (7th Cir. 1980) (citation omitted). For the reasons set forth below, this Court should issue such an order pending its resolution of the merits of the preliminary injunction motion so that the Department has a full and fair opportunity to respond, while

assuring that Plaintiffs and over 100 million others similarly situated are not irreparably and irreversibly harmed by the immediate implementation of the ESG Rule.

As a threshold matter, Plaintiffs are properly before this Court. As plan participants and beneficiaries, Plaintiffs are within the zone of interests intended to be protected by ERISA and its attendant regulations. 29 U.S.C. §§ 1104(a), 1132; *Univ. of Wis. Hospitals & Clinics, Inc. v. Aetna Life Ins. Co.*, 24 F. Supp. 3d 808, 814 (W.D. Wis. 2014) (noting ERISA's "purposeful protection of plan participants and beneficiaries"). Standing is conferred broadly in the ERISA context to effectuate the statute's protections for workers and beneficiaries. *See Sladek v. Bell Sys. Mgmt. Pension Plan*, 880 F.2d 972 (7th Cir. 1989).

Federal law explicitly provides individuals like Plaintiffs with the right to invoke federal jurisdiction. In addition to vindicating their individual rights under plans, such as a plan administrator's failure to diversify investments, monitor investments, or minimize costs, 29 U.S.C. § 1132(a), ERISA provides participants and beneficiaries with the right to sue the Secretary of the Department of Labor to "restrain" him "from taking any action contrary to the provisions of this chapter." 29 U.S.C. § 1132(k). Plaintiffs are residents of this district and are participants in ERISA plans, and they are therefore properly before this Court. (Dkt. 1,¶¶ 12-13).

## II.    Plaintiffs are likely to succeed on the merits of their claims

Injunctions in the Seventh Circuit are evaluated using a "sliding scale" approach, whereby "the greater the moving party's likelihood of success . . ., the less heavily the balance of harms must weigh in its favor, and vice versa." *In re A & F Enters., Inc. II*, 742

- 7 -

F.3d 763, 766 (7th Cir. 2014) (citation omitted). For the reasons set forth below, Plaintiffs have a strong likelihood of success on the merits of their claims under both the text of ERISA itself and the Administrative Procedure Act.

**A.    The ESG Rule Violates ERISA, and the Secretary Should Be Enjoined from Implementing It.**

Although the application of certain aspects of ERISA can be quite murky and technical, one guiding light always shines through: ERISA plans are in place for the financial benefit of the workers who contribute to them and the beneficiaries that those workers designate. If the employer, a financial services company, or society at large benefits from a worker's participation in an ERISA plan, any such benefit is necessarily secondary to the goal of providing participants with a secure income stream in retirement. This interest itself inures to society; encouraging responsible retirement investment for the future now means less cost to the American taxpayer later. That income stream is, in turn, protected by a series of statutory protections that courts have consistently enforced for the last five decades.

In ERISA, Congress both imposed a fiduciary duty upon plan administrators and defined the parameters of that duty. The statute's text unambiguously requires that plan administrators act "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1). This is known as the "exclusive benefit" rule, and it "derives from one of the most fundamental and distinctive principles of trust law, the duty of loyalty." *Halperin v. Richards*, 7 F.4th 534,

545-46 (7th Cir. 2021) (internal quotation marks and quoting citation omitted). This duty is the "highest known to the law," *id.* at 546 (quoting citation omitted), and means that plan fiduciaries are required to put the financial interests of the employees who participate in the plan (and the beneficiaries they designate) first. Any attempt to subvert that interest is a breach of their duties under ERISA. Breaches are typically divided into two categories: breach of the duty of prudence and the duty of loyalty. The duty of prudence requires a fiduciary to select investments for plan participants that a person of ordinary prudence would in a similar situation. The duty of loyalty prohibits self-dealing and other conflicts of interest. *Mass. Mutual Life Ins. Co. v. Russell*, 473 U.S. 134, 154 n.10 (1985) (citations omitted).

Under Supreme Court precedent, it is usually "not imprudent to assume that a major stock market" would provide the "best estimate of the value of the stocks traded on it that is available" to the fiduciary. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 427 (2014) (quoting *Summers v. State Street Bank & Trust Co.*, 453 F.3d 404, 408 (7th Cir. 2006)). Fiduciaries are not expected to "outsmart a presumptively efficient market." *Id.* (quoting citation omitted). But they are expected to rely upon publicly available data that provides the best available information about the value of the investments to which they contribute plan participants' money.

The ESG Rule is problematic because it attempts to redefine, via regulation, what constitutes a prudent investment. For five decades, the hallmark of sound investment choices has been financial return for plan participants. For instance, the interpretive regulations have long provided that a plan administrator has fulfilled the duty of prudence

- 9 -

if he or she has "given appropriate consideration to those facts and circumstances that, given the scope of such fiduciary's investment duties, the fiduciary knows or should know are relevant" to the investment and acts accordingly. *See* 59 Fed. Reg. 32606 (June 23, 1994) (permitting fiduciary selection of "economically targeted investments" that include factors outside of gain so long as the fiduciary does not "subordinat[e] the interests of participants and beneficiaries in their retirement income to unrelated objectives"); 73 Fed. Reg. 61734, 61735 (Oct. 17, 2008) (clarifying that fiduciaries "may not select investments on the basis of any factor outside the economic interest of the plan except in very limited circumstances" and that the statute's "text does not permit fiduciaries to make investment decisions on the basis of any factor other than the economic interest of the plan"). Consistent with this past guidance, the 2020 Rule permitted ESG considerations to be used, but only where those factors were used as a tiebreaker between two options that are equal. (Ex. 2 at 72883-84.)

But the ESG Rule goes a step further and explicitly injects ESG factors into fiduciaries' consideration:

> (4) A fiduciary's determination with respect to an investment or investment course of action must be based on factors that the fiduciary reasonably determines are relevant to a risk and return analysis, using appropriate investment horizons consistent with the plan's investment objectives and taking into account the funding policy of the plan established pursuant to section 402(b)(1) of ERISA. *Risk and return factors may include the economic effects of climate change and other environmental, social, or governance factors on the particular investment or investment course of action.* Whether any particular consideration is a risk-return factor depends on the individual facts and circumstances. The weight given to any factor by a fiduciary should appropriately reflect a reasonable assessment of its impact on risk-return.

(Ex. 1 at 73885 (emphasis added).)

As noted, the issue is not that ESG factors are mentioned or included; the 2020 rule explicitly permitted such investments, but it did so on the condition that fiduciaries only rely on such factors if "the plan fiduciary is unable to distinguish" two potential investments "on the basis of pecuniary factors alone." 85 Fed. Reg. 72884. Additionally, as a safeguard, fiduciaries in such situations were required to document how the two investments compared and how the ESG or other noneconomic factors "are consistent with the interests of participants and beneficiaries in their retirement income or financial benefits." *Id.* In contrast, the new ESG Rule places no real limitation on how fiduciaries may choose to use these factors and no requirement that the fiduciaries "show their work" when it comes to selecting an investment on a basis other than financial return. This attempt to redefine risk and return undercuts the duty of prudence written into the statute and Congress's concern that investment decisions be made for the "sole" benefit of the participants. The "sole" benefit that every ERISA participant has in common, no matter the employee's job or political stripe, is not a desire to save the planet or to ensure diversity in a company's executive ranks, but to maximize savings for retirement. This is the public policy behind ERISA, and it uses both carrots (tax incentives) and sticks (penalties for early withdrawal) to accomplish this objective. *See* 26 U.S.C. § 401 *et seq.* (describing deductions); *In re Cilek*, 115 B.R. 974, 988, n.15 (Bankr. W.D. Wis. 1990) (describing aspects of retirement plans and penalty for early withdrawal as valid expression of public policy).

In addition to its attempt to redefine the substance of the fiduciary duty of prudence, the ESG Rule eliminates another protection for employees when it comes to ESG investing:

- 11 -

documentation. As noted, the 2020 rule permitted the use of ESG in investment decisions so long as the decisionmaker documented that choice. The new ESG Rule eliminates that documentation requirement entirely, reasoning that providing information to employees will act as a "red flag" encouraging lawsuits against plan fiduciaries. (Ex. 1 at 73838.) But removing protections for participants is contrary to the letter and spirit of the law.

One of the primary reasons ERISA was put in place in the first place was to provide retirees with more information about their own retirement and information that could be used, if necessary, to hold those making investment decisions accountable. Congress noted in ERISA's findings that workers lacked sufficient information about their own retirement accounts and sought to correct that imbalance through the statute. 29 U.S.C. § 1001(a) ("[I]t is desirable in the interests of employees and their beneficiaries . . . that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans"). In fact, refusing disclosure of certain items of plan information is actionable under the law (even absent any other violation), with strict financial penalties for withholding information from participants. 29 U.S.C. § 1132(c)(1).

These disclosures historically include information about the administrative and investment costs, explanations of events having a material effect on liabilities or assets of the plan, and notice of blackout dates, among others. 29 U.S.C. § 1104(c)(1)(A)(ii). Nor was the 2020 rule's requirement dictating disclosure of additional information related to ESG investment choices an anomaly. Historically, certain types of investments that may fail to provide the same return as other plan options have required additional disclosures to alert plan participants to this risk. *See, e.g.*, 75 Fed. Reg. 64910, 64916 (Oct. 20, 2010)

- 12 -

(discussing disclosures related to fixed-income products). It is wholly inconsistent with ERISA's text and past practice *not* to require disclosure of information to participants that may directly affect the value of their retirement accounts, and the Secretary acted beyond the scope of his authority in promulgating a rule that eliminates transparency.

Finally, Plaintiffs anticipate that the Department will argue that retirees' investments in ESG funds can be result of free choice, which can in some cases relieve plan fiduciaries of liability. *See generally* 29 U.S.C. § 1004(c). A retiree who selects a high-risk, long-term fund cannot generally turn around and sue three years later on the theory that the short-term risks were not disclosed to him or her or that he or she was not persuaded to invest in a different, more appropriate type of fund. Plan administrators are not psychic beings that can predict every investment with certainty, nor are they expected to inherently know and understand each individual retiree's risk tolerance. But neither are plan administrators relieved of liability simply by providing a wide menu of available options to plan participants. The law is clear that plan administrators are under a continuing duty to evaluate the menu of options they provide to ensure that all of the available options meet the standard of prudence. *See Hughes v. Northwestern Univ.*, 142 S.Ct. 737 (2022) (mere fact that ERISA plan offered a variety of options from which employees chose did not foreclose liability for breach of duty of prudence). "[R]elying on the participants' ultimate choice over their investments to excuse allegedly imprudent decisions" by plan administrators is contrary to ERISA. *Id.* at 738.  In short, offering some options that perform well over time and some that do not, without making efforts to evaluate and potentially replace the poor performers, can leave fiduciaries on the hook for a breach of

the duty of prudence. This result makes sense both because of the statute's requirement that the fiduciary act in the participants' and beneficiaries' "sole" interest and because of the common law used to interpret the statute.

ERISA draws on the law of trusts. *French v. Wachovia Bank, N.A.*, 722 F.3d 1079, 1085 (7th Cir. 2013) (citations omitted). "An ERISA fiduciary must act as though he were a reasonably prudent businessperson *with the interests of all the beneficiaries at heart*." *Chesemore v. Alliance Holdings, Inc.*, 886 F. Supp. 2d 1007, 1041 (W.D. Wis. 2012) (quoting *Jenkins v. Yager*, 444 F.3d 916, 924) (internal quotation marks omitted) (emphasis added). The job of a fiduciary, much like that of a trustee in other contexts, is to look out for the beneficiaries' best interests—even when that may be contrary to the beneficiaries' stated desires. For example, the beneficiary of a trust fund with assets set aside to pay for her education may want to use the funds to buy a pony instead, but the trustee's duty is to ensure the funds are used for their stated purpose. Here, too, the fiduciary is not simply a stockbroker directed to mechanically carry out the trades to support particular causes the beneficiaries may like; he or she is directed, by text of federal law, to invest those funds to maximize investment return and for no other purpose. Thus, any argument that "free choice" ought to prevail to keep the ESG Rule in place, even for the investors who are interested in ESG investing and would choose it if offered, is contrary to law.[5] When

---

[5] In fact, this is even the case in general trust law where the trustee and the beneficiary are the same person—the individual still retains the same obligations and the "fact that the trustee and beneficiary are the same person does not erase the fiduciary role assumed in acting as trustee in administering the trust." *In re Neely*, 608 B.R. 806, 818 (Bankr. N.D. Ill. 2019) (quoting citation omitted). "ERISA clearly assumes that trustees will act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries." *Central States, Se. & Sw. Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 571 (1985).

- 14 -

evaluating whether a decision is prudent, "[t]he trustee cannot shift the burden of decision to others." *Bogert's The Law of Trusts and Trustees*, § 541 (June 2022). The fiduciary may not duck a professional duty of prudence by simply relying on an expert's advice or the requests of the beneficiary. Independent judgment is necessary.

The ESG Rule's declaration that ESG considerations are proper risk-return factors is inconsistent with this black letter law. As earlier noted, the results of ESG investments that have been studied to date are, at best, mixed.[6] It is purely speculative to place a dollar figure on a sustainability initiative or attempt to predict the effect of a new corporate diversity policy on stock price. There is thus no easy way to measure whether investments that weigh these factors are prudent, or at what tipping point within a particular portfolio they become imprudent. And because the ESG Rule lifts the requirement that plan administrators show their work when it comes to ensuring that ESG factors do not supplant the first consideration of financial return, there is little hope that retirees will be able to hold fiduciaries accountable for any malfeasance.

In a traditional breach of duty of prudence case, a plaintiff can point to public information available to a plan administrator that either supplies comfort or raises red flags. For example, a fiduciary determining whether to invest in shares of a clothing company might look at the company's stock price, as well as earnings predictions and estimates of demand, work stoppages and strikes in the country where the clothing is made, and trends

---

[6] Wayne Winegarden, "Environmental, Social, and Governance (ESG) Investing: An Evaluation of the Evidence," Pacific Research Institute (2019) https://www.pacificresearch.org/wp-content/uploads/2019/05/ESG_Funds_F_web.pdf (ESG funds netted a return 43.9% lower than if the same funds had been invested in the S&P 500).

across the fashion industry to determine whether the stock price is likely to rise, fall, or remain steady over a particular time horizon. Failure to examine these factors or to act when new information arises may provide evidence of imprudence by the fiduciary, depending upon the circumstances. But where the driving factor is a company's announcement that it plans to cut its carbon footprint by 50% or has set an aspirational goal of hiring a certain percentage of leaders of color for its c-suite, there is no accepted method for predicting how that factor will influence investment over a particular time horizon. Tellingly, were there a way to quantify such a factor, the ESG Rule's insertion of these factors into fiduciaries' consideration would be wholly unnecessary. Any of these policies that would be known to result in better financial return would win out on their merits and there would be no need to spotlight them as permissible considerations via a federal regulation. ERISA is not a political tool; it is a law intended to promote and protect retirement investments. The rule's attempt to redefine ESG investments as prudent by classifying ESG considerations as "risk return factors" is an impermissible end-around this fundamental principle.

There is plenty of room in the market for those who want to invest their savings in ESG funds if they truly and freely choose. People can work with an individual financial advisor and select stocks based on whatever their personal, political, or other preferences are. They can buy individual stocks through services like Robin Hood. But what the ESG Rule allows is different than that. The ESG Rule permits the plan administrator to determine whether and how much to gamble in these investments *with others' money*, and without requiring the fiduciary to document the extent of the influence of these non-

pecuniary factors or even to offer an option in which financial return alone, without consideration of these ESG factors, continues to be an option. Providing this degree of unfettered discretion to fiduciaries is contrary to the law's stated congressional purpose to "protect[] . . . beneficiaries by requiring disclosure and reporting." 29 U.S.C. § 1001(b). It is also inconsistent with providing an incentive to save for the individual participant's retirement (or, in the absence of the participant at retirement, for the participant's designated beneficiaries). If that central purpose is not kept in focus, ERISA becomes nothing more than a tax-advantaged tool to benefit the preferred political class of companies the current administration has selected.

Furthermore, even assuming that individual choice could otherwise save the ESG Rule, any arguments concerning individual investor choice cannot, by definition, apply to retirees who are invested in the plan's qualified default investment alternative (QDIA). A participant's funds may end up in a QDIA either because the participant makes no selection, or because the alternative in which the participant originally invested is no longer available. Under the 2020 rule, it was not permissible to invest based on ESG considerations if the fund was a QDIA. 85 Fed. Reg. 72884 at § 2550.404a-1(d). As the commentary to that rule noted, investors in a QDIA are less likely to have sophistication and investment know-how than someone who has made a plan selection. For that reason, "prophylactic measures are in place to avoid threats to their share of capital over the long term." 85 Fed. Reg. 81658, 81666 (Dec. 16, 2020). In other words, keeping ESG considerations out of QDIAs protected these investors. While it could conceivably be the case that a participant who selects an "ESG fund" as their option has exercised a degree of

- 17 -

choice (though, for the reasons set forth above, an individual's political preference or desire for ESG investing is irrelevant), the same argument cannot be made of someone who has not selected an option *at all*.

The QDIA aspect is one problematic facet of the fallacy of free choice that the DOL will likely advance. Another is apparent based on what is *not* included in the ESG Rule—namely, any requirement that plan fiduciaries offer any non-ESG options at all. This is particularly troubling when one considers that ERISA plans are becoming increasingly "automatic" in nature[7], requiring little input from the participants. While there is no denying that there is a segment of the investing population that likes the option of ESG investing, there is also a significant portion of the population that would not choose that option if offered to them.[8] If the data showed that ESG investments were the highest performing investments, the personal preference of the latter group against such investments would not matter in the ERISA context—just as the pro-ESG investors' political preferences do not matter now. Whatever the most profitable investment is is the one that serves the "sole" interest of the participants, and therefore should win out. DOL cannot put a thumb on the scale by defining risk and return factors to include ESG considerations.

Congress passed ERISA in an effort to protect employees and their beneficiaries from underhanded practices, including but not limited to conflicts of interest, that could see them swindled out of their hard-earned money. To ensure that these interests were

---

[7] https://www.finra.org/investors/investing/investment-accounts/retirement-accounts

[8] https://news.gallup.com/poll/389780/investors-stand-esg-investing.aspx

protected, Congress made plan administrators fiduciaries to these participants and beneficiaries, requiring them to act in the participants' sole interest—not in the interest of the plan administrator, the employer, or unrelated social policies. Congress also encouraged participants to vindicate their rights and discouraged unequal treatment by providing exclusive federal jurisdiction and awarding fees and costs to prevailing plaintiffs in appropriate cases. 29 U.S.C. §§ 1101(b) (emphasizing ERISA's policy to "protect" the "interests of participants . . . and their beneficiaries" "by providing for appropriate remedies, sanctions, and ready access to the Federal courts"); 1132 (listing civil remedies).

The ESG Rule exceeds the Secretary's authority, and this Court should immediately restrain its implementation. Congress passed ERISA to secure retirement for American workers of all walks of life by requiring plan administrators to put participants' financial interests first. 29 U.S.C. § 1104(a). It was not intended to be used as a political weapon or an end-run around congressional action. The ESG Rule contravenes both the text and spirit of ERISA and should be immediately enjoined.

**B.    The ESG Rule Violates the Administrative Procedure Act.**

In addition to violating the text of ERISA itself, the ESG Rule also offends the APA. The APA provides that courts will "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

An agency action is arbitrary or capricious if the agency relies on factors which Congress had not intended the agency to consider. *Zero Zone Inc. v. U.S. Dep't of Energy*,

- 19 -

832 F.3d 654, 677 (7th Cir. 2016) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007)). ERISA's statutory text is clear on the "sole" factor that is germane when it comes to retirement plans: investment return. It is irrelevant whether a company's majority shareholder is a Republican or a Democrat, whether the corporate slogan references "black lives matter" or "back the badge," or whether the individual plan participants and beneficiaries would select a particular investment target's product if they themselves are shopping in a retail store. All that matters is whether the plan's investment will maximize financial return. For the reasons further elaborated on in section II.A, *supra*, the ESG Rule relies on factors not contemplated by Congress and therefore violates the APA.

In addition to violating the APA as arbitrary and capricious, the ESG Rule also contravenes the law because it exceeds the Department of Labor's statutory jurisdiction and authority. When considering whether the ESG Rule exceeds statutory jurisdiction and authority, the court must consider the intent of Congress and, if that intent is clear, give effect to that intent. *Reverse Mortgage Solutions, Inc. v. U.S. Dep't of Housing & Urban Dev.*, 365 F. Supp. 3d 931, 947 (N.D. Ill. 2019) (citation omitted). Only if Congress "has not directly addressed the precise question at issue" will courts then assess whether the agency's action is based on a permissible construction of the statute. *Id.*

In this instance, the ESG Rule violates the APA under either prong. Congress has explicitly defined the duty of prudence in the ERISA statute, and it is done so unambiguously: plan administrators are to act in the "sole" interest of participants and beneficiaries to maximize their financial return. Other considerations are ancillary. The

- 20 -

statute's text does not leave room for interpretations that put other factors on par with financial return. And the ESG Rule's lip service to the concept that financial return may not be subverted to other interests cannot save the regulation where there are no transparency mechanisms to ensure that result. But even if this Court were to determine that some ambiguity existed, the agency's interpretation of the duty of prudence is not a reasonable one given the facts and circumstances. Congress has not authorized the Department to make environmental policy, to implement corporate diversity initiatives, or to oversee securities laws associated with proxy voting—all of which are implicated by the ESG Rule. (Ex. 1 at 73844, 73859.)

Whether Congress *could* authorize DOL (or other agencies) to do any of these things may well be debated another day, but there can be no dispute that there is no congressional action, whether in the form of an amendment to ERISA or otherwise, that provided the Secretary with the authority to undercut the explicit statutory language that retirement plans be administered "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). Administrative regulations that contradict the letter of duly enacted federal law are void and of no effect:

> The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is not the power to make law- for no such power can be delegated by Congress- but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity.

*C.I.R. v. Clark*, 202 F.2d 94, 98 (7th Cir. 1953) (quoting citation omitted).

- 21 -

For all of the same reasons that the ESG Rule is contrary to the text of ERISA and must be enjoined under 29 U.S.C. § 1132(k), it also violates the APA because it violates the constitutional separation of powers. The Secretary does not have the authority to redefine the statutory duty of prudence imposed upon plan fiduciaries by simply defining ESG factors as "risk return" factors appropriate for consideration. Congress has made no such authorization, nor has it eliminated, altered, or diminished ERISA's command that choices be made in the participants' and beneficiaries' "sole" interest. This Court should therefore conclude that Plaintiffs are likely to succeed on the merits of both their claims and enjoin the ESG Rule while the litigation is pending.

## III. Preliminary injunctive relief is required because ordinary legal remedies are inadequate.

Plaintiffs seek a declaration and forward-looking relief enjoining the ESG Rule. While many of the consequences of the Rule's implementation are ultimately financial in nature, in that the assets from Plaintiffs' and millions of other retirement accounts could then be invested in funds that may subvert financial returns to impermissible nonpecuniary factors and lead to financial losses, a second deprivation also occurs. By eliminating accountability through disclosure, the ESG Rule gives cover to potential breaches of fiduciary duty by plan administrators and trustees, which will become all but untraceable if the ESG Rule is implemented as published.

Additionally, due to the fluctuation of markets and the impossibility of determining with hindsight what investments would otherwise have been made and the consequences of those choices not made, damages would be impossible to quantify. In cases where

- 22 -

damages are difficult or impossible to ascertain, courts have held that injunctive relief is appropriate. *See*, *e.g.*, *Romper Room Inc. v. Winmark Corp.*, 60 F. Supp. 3d 993, 997 (E.D. Wis. 2014) (absent an injunction, loss of good will and reputation of store that would otherwise be forced close pending litigation weighed in favor of injunction). That rule applies here; on "each day in which a fiduciary fails to remove an imprudent investment, a new breach is born" because "an ERISA trustee has an *ongoing* duty to act prudently." *Spano v. The Boeing Co.*, 125 F. Supp. 3d 848, 859 (S.D. Ill. 2014) (citing *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078, 1087-88 (7th Cir. 1992)). After all, dealing with this scenario any other way would leave fiduciaries "free to engage in repeated violations, so long as they have once been discovered but not sued." *Id.*

ERISA is in place to safeguard "employee information and adequate safeguards concerning" the operation of retirement plans. 29 U.S.C. § 1001(a). Millions of workers rely on plan fiduciaries to select investment options that will maximize their returns. If implemented, the ESG Rule will permit fiduciaries, in their sole discretion, not only to select investments that studies have shown may have significantly less financial return, but to do so without documenting a reason for such choices.

There are at least two problematic aspects to this. First is the actual loss stemming from imprudent investment choices. DOL will likely argue that plan administrators do not have crystal balls or psychic powers, and while nobody disputes that, such strawman arguments ignore the reality. Plan administrators are not tasked with picking every winner or avoiding every loser, but they are expected to rely on data and information that has become commonplace in the market to make predictions of future value as best they can—

- 23 -

information like stock price, profit and loss statements, projected sales figures, materials costs, and other reliably quantifiable predictors of future growth. *Dudenhoffer*, 573 U.S. at 426-27 (ERISA fiduciaries "may, as a general matter, likewise prudently rely on the market price" of a security to determine value); *Patten v. Northern Trust Co.*, 703 F. Supp. 2d 799, 811 (N.D. Ill. 2010) (prudence includes consideration of "the nature and extent of challenges facing the company that would have an effect on stock price and viability") (citation omitted).

Nothing in the ESG Rule or its commentary explains how ESG factors, such as an employer diversity's program or corporate board transparency measures, translate into dollars over any time horizon, now or in the future. There are reasons why ERISA has focused solely on financial returns for five decades. Retirement investment decisions made by fiduciaries allegedly acting in the plan members' best interests—whatever their race, religion, or political persuasion—are intended to *protect workers' financial interest in retirement*.

Second, ERISA regulations have traditionally permitted fiduciaries to consider factors outside of pecuniary return, but *only* if the fiduciary has reviewed the available investment options, determined that they are roughly equivalent, and documents the use of the nonpecuniary factors as a tiebreaker. The Biden administration explicitly considered and then rejected such a requirement in the ESG Rule, expressing concern that documentation would raise a "red flag" for such investments. (Ex. 1 at 73838) ("The documentation requirement also may be viewed by fiduciaries as a self-reported 'red flag' that uniquely directs potential litigants' attention to tie-breaker decisions as inherently

- 24 -

problematic, even though there is no necessary or presumed inconsistency between their use and the requirements of ERISA.[9]"). But this argument is wrong for at least two reasons. First, if the ESG investment is a legitimate one and the soft variables are just being used as a tiebreaker, the documentation will only help the fiduciary defend the decision. And second, if in fact it is questionable to put financial value on ESG factors, the proper response to this is further study before authorizing and endorsing their use, or at the very least requiring fiduciaries to prudently document how such factors are used—not to subvert the concept of fiduciary duty to the current president's political whims.

A nationwide injunction is appropriate in light of the wide-ranging impact that implementation of the rule would have on the tens of millions of retirement plan participants and beneficiaries, whose retirement accounts could be invested in accordance with the new rule without any recourse. The Seventh Circuit has expressly held that nationwide injunctions are authorized in appropriate cases. *City of Chicago v. Barr*, 961 F.3d 882, 918 (7th Cir. 2020) ("courts have the authority to extend injunctive relief to non-parties"). Nationwide injunctive relief is appropriate in serious cases, and may be imposed "to provide complete relief to plaintiffs, to protect similarly-situated nonparties, and to avoid the chaos and confusion that comes from a patchwork of injunctions." *Id.* at 917. Such relief is appropriate in this case because over 140 million Americans are currently subject to an ERISA plan.[10]

---

[9] For the reasons set forth above, Plaintiffs obviously disagree with the last clause.

[10] https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/what-is-erisa (141 million workers and beneficiaries (or 54% of the American workforce) is covered by an ERISA plan).

**IV.    Plaintiffs will suffer irreparable harm if preliminary injunctive relief is not granted.**

The concepts of inadequate remedy at law and irreparable harm are distinct, but in this case closely related. A harm is irreparable if it "cannot be prevented or fully rectified by the final judgment after trial." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858 F.3d 1034, 1045 (7th Cir. 2017).

The existence of a continuing constitutional violation is proof of an irreparable harm for purposes of a preliminary injunction. *NA Main Street LLC v. Cook*, 508 F. Supp. 3d 320, 331 (S.D. Ind. 2020) (quoting *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978)). But in addition to the separation of powers issues implicated by the ESG Rule, as a practical matter anything short of preliminary injunctive relief will damage not only Plaintiffs' retirement funds but also the over one hundred million retirement accounts similarly situated. Once made, it will be impossible to unravel or assess damages for imprudent investment decisions made under cover of the ESG Rule because the regulation not only permits fiduciaries to make investments based on factors outside of those Congress wanted considered, but is authorizing these decisions in such a way that fiduciaries cannot be easily held to account. Under the 2020 rule, a fiduciary who made an imprudent decision by subverting non-financial interests to ESG factors could be effectively held liable through the fiduciaries' evaluation of the investment alternatives. (Ex. 2 at 72884.) With that requirement eliminated, participants and beneficiaries will be unable to fairly trace why factors outside of return were considered in the first place, much less whether such decisions were justified in light of all the information. Eliminating the disclosure

- 26 -

requirement puts the fiduciaries before those they are statutorily bound to serve, and creates an additional, irreparable harm to them—the effective deprivation of the participants' statutory remedy for breach of the duty of prudence. 29 U.S.C. § 1132(a)(1)(B).

## V.     The balance of harms favors plaintiffs.

Having established that they are likely to prevail on the merits of their claim and will suffer irreparable harm absent an injunction, the court then inquires whether the balance of harms favors the plaintiffs or the defendant. *Turnell*, 796 F.3d at 662. The more likely the plaintiff is to win on the merits, the less the balance of harms need weigh towards the plaintiff's side. Conversely, the less likely it is that the plaintiff will succeed, the more the balance need weigh in the plaintiff's favor. *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992) (citation omitted). The calculus "also takes into consideration the consequence to the public interest of granting or denying preliminary relief." *Id.* (citations omitted). Courts examine the irreparable harm the moving party will endure if the injunction is wrongfully denied and versus the irreparable harm to the non-movant if wrongfully granted, as well as the effects that the grant or denial would have on nonparties. *Turnell*, 796 F.3d at 662 (citations omitted). In light of Plaintiffs' strong case on the merits, outlined above, and the balance of harms, an injunction is warranted.

### A.     The harm to Plaintiffs and all others similarly situated is irreparable and unquantifiable, and a preliminary injunction is in the public interest.

The "enforcement of unconstitutional laws by itself imposes an irreparable harm." *NA Main Street*, 508 F. Supp. 3d at 333. Furthermore, there is "no harm" when the government "is prevented from enforcing an unconstitutional" law. *Joelner v. Vill. of*

- 27 -

*Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004). As described at length above, American workers risk the loss of not only the money they have worked to contribute through imprudent investments, but also the ability to hold those who may make such imprudent decisions to account.

This lawsuit is not about a particular act of malfeasance, and it is not Plaintiffs' or their counsel's intent to paint all fiduciaries as bad actors. In fact, Plaintiffs' arguments will likely save fiduciaries headaches in the long run, as beneficiaries will likely sue for breach of fiduciary duty if returns were not maximized due to ESG investing.[11] But ERISA's purpose has always been to provide safeguards for current and future retirees by completely shutting out motivations other than maximizing their financial return. To crack open the door to other motivations undercuts the national interest in protecting retirement accounts and could cause plan participants and beneficiaries to question the integrity of not only their own fiduciaries' actions, but of the system as a whole. This harm, combined with potential investment losses and the inability to hold imprudent actors accountable, suggests an immediate injunction is in the public interest.

**B.      There is no harm to either the Secretary or the public.**

While an injunction preventing the potentially imprudent investment of funds from over one hundred million accounts is in the public interest, there is no harm to the government or the public at large in maintaining the status quo while the merits of this

---

[11] *See Meyer v. Berkshire Life Ins. Co.*, 250 F. Supp. 2d 544, 565 (D. Md. 2003) (citing 29 U.S.C. § 1104(a)(1)(B)'s "mandate" that "a fiduciary be prudent in each investment decision"); *Killian v. Concert Health Plan*, 742 F.3d 651, 665 (7th Cir. 2013) (deceased participants' widower stated claim for breach of fiduciary duty, and where there is ambiguity the fiduciary may expose itself to liability for mistakes). It is not difficult to imagine a beneficiary making either a legitimate or an enterprising claim concerning the fiduciary's investment choices.

- 28 -

challenge to the ESG Rule are litigated. Neither the Secretary nor the Department more generally will suffer any harm from a delay in implementing the rule, if this Court ultimately rules against Plaintiffs, and the public is not harmed either. Nothing in this lawsuit prevents individual investors from directing their own discretionary funds to the companies they wish to support via day trading or work with their individual financial advisor. All Plaintiffs seek to restrict is the ability of plan administrators and fiduciaries to invest funds that are subject to ERISA plans. Furthermore, as explained in the section above concerning likelihood of success, the ESG Rule represents an unconstitutional violation of the separation of powers, in that only Congress has the ability to pass new laws related to environmental regulation. There is no legitimate interest in sustaining an unconstitutional policy and no harm to the public in preventing one.

Finally, Plaintiffs should not be required to post a bond. "Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)." *Wayne Chem., Inc. Columbus Agency Serv. Corp.*, 567 F.2d 692, 701 (7th Cir. 1977). The district judge "has the discretion to determine what amount of security, if any, is necessary to protect the enjoined party's interest." *Citizens for a Better Environment v. Vill. of Elm Grove*, 472 F. Supp. 1183, 1184 (E.D. Wis. 1979) (citations omitted); *see also Wood-Schultz v. Schultz*, No. 11-C-975, 2011 WL 6888702 at *3 (E.D. Wis. Dec. 30, 2011) (concluding that the "proper amount of security to require" is "zero dollars" where there is a strong likelihood of success and a high probability of irreparable harm). Here, Plaintiffs are individual retirement account holders represented by *pro bono* counsel who, by this lawsuit, seek to hold federal government officials to their longstanding ERISA duties under

the law. While there are certainly negative financial consequences to the Plaintiffs absent an injunction, there are not corresponding financial harms to the government actors (or to other retirees) in keeping the status quo while the merits of the ESG Rule are decided, and Plaintiffs therefore request that they not be required to post any bond.

## CONCLUSION

For the foregoing reasons, this Court should enter a nationwide temporary restraining order pending resolution of Plaintiffs' request for a preliminary injunction, enjoining the Secretary and the Department from implementing the ESG Rule during the pendency of this litigation.

Dated this 28th day of February, 2023.

WISCONSIN INSTITUTE FOR
LAW & LIBERTY, INC.

s/ *Katherine D. Spitz*

Richard M. Esenberg (WI Bar No. 1005622)
Katherine D. Spitz (WI Bar No. 1066375)
Lucas T. Vebber (WI Bar No. 1067543)
Daniel P. Lennington (WI Bar No. 1088694)
330 East Kilbourn Avenue, Suite 725
Milwaukee, WI 53202
Telephone: (414) 727-9455
Facsimile: (414) 727-6385
Rick@will-law.org
Kate@will-law.org
Lucas@will-law.org
Dan@will-law.og

*Attorneys for Plaintiffs*