**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

_____

RICHARD BRAUN, *et al.*,                    )
                                            )
                        Plaintiffs,         )
            v.                              )          Case No. 2:23-cv-234
                                            )
JULIE A. SU, in her official capacity       )
as Acting Secretary of Labor,               )
                                            )
                        Defendant.          )
_____)


**DEFENDANT'S OPPOSITION TO**
**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**
**AND TEMPORARY RESTRAINING ORDER**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................3

I.      Statutory Framework .............................................................................................3

II.     Regulatory Background .........................................................................................4

        A.      Pre-2020 Sub-Regulatory Guidance ..........................................................4

        B.      The 2020 Rules ..........................................................................................6

        C.      Executive Orders and Stakeholder Outreach .............................................7

        D.      The Investment Duties NPRM and Final Rule ..........................................9

III.    Procedural History ..............................................................................................12

ARGUMENT .....................................................................................................................13

I.      The Extraordinary Remedy of a Preliminary Injunction Is Not Warranted Here...................13

        A.      Plaintiffs Have Not Shown Irreparable Harm. ........................................13

        B.      Plaintiffs Have Not Demonstrated a Substantial Likelihood of Success on the Merits.
                ..................................................................................................................16

                1.      The Rule Falls Within DOL's Statutory Authority. ......................17

                        a.      The Rule is within DOL's broad regulatory authority to carry out
                                ERISA. ...............................................................................17

                        b.      The plain language of ERISA does not preclude the Department's
                                interpretation......................................................................20

                        c.      The Department's reasoned interpretation is entitled to deference. .21

                2.      The Rule Is the Product of Reasoned Decisionmaking. ................22

                        a.      The prudence standard is reasonable. ................................23

                        b.      The tiebreaker provision is reasonable................................24

                        c.      It was reasonable to eliminate the tiebreaker documentation
                                requirement. ......................................................................25

                        d.      It was reasonable to remove the 2020 Rules' specific restrictions on
                                QDIAs. ...............................................................................27

i

      C.     A Preliminary Injunction Would Not Serve the Public Interest. ...................................27

II.    Any Relief Granted Should Be Appropriately Limited. ...........................................................29

CONCLUSION...................................................................................................................................29

# TABLE OF AUTHORITIES

**Cases**

*AARP v. EEOC,*
  226 F. Supp. 3d 7 (D.D.C. 2016) .......................................................................... 14

*Am. Fed'n of Lab. & Cong. of Indus. Org. v. Chao,*
  409 F.3d 377 (D.C. Cir. 2005) .............................................................................. 29

*Anglo-American Inv. Trust, Ltd. v. Pearson,*
  294 F. Supp. 1150 (E.D. Wis. 1969) ............................................................... 14, 15

*Bagdonas v. Dep't of Treasury,*
  93 F.3d 422 (7th Cir. 1996) .................................................................................. 22

*Bedrossian v. Nw. Memorial Hosp.,*
  409 F.3d 840 (7th Cir. 2005) ................................................................................ 14

*Chevron v. NRDC,*
  476 U.S. 837 (1984) ............................................................................................. 21

*Citizens to Preserve Overton Park v. Volpe,*
  401 U.S. 402 (1971) ............................................................................................. 23

*City of Arlington, Tx. v. FCC,*
  569 U.S. 290 (2013) ............................................................................................. 17

*City of Chicago v. Barr,*
  961 F.3d 882 (7th Cir. 2020) ................................................................................ 29

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ............................................................................................. 15

*Ctr. for Bio. Diversity v. Trump,*
  453 F. Supp. 3d 11 (D.D.C. 2020) ........................................................................ 27

*Dalton v. Specter,*
  511 U.S. 462 (1994) ............................................................................................. 27

*DHS v. New York,*
  140 S. Ct. 599 (2020) ........................................................................................... 29

*Doe v. Univ. of S. Indiana,*
  43 F.4th 784 (7th Cir. 2022) ................................................................................ 13

*Exelon Wind 1, LLC v. Nelson,*
  766 F.3d 380 (5th Cir. 2014) ................................................................................ 22

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ................................................................................ 15

iii

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) ........................................................................................ 22

*Fifth Third Bancorp v. Dudenhoffer*,
    573 U.S. 409 (2014) ........................................................................................ 20

*GEFT Outdoors, LLC v. City of Westfield*,
    922 F.3d 357 (7th Cir. 2019) ........................................................................ 13

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) .................................................................................. 29

*Halczenko v. Ascension Health, Inc*,
    37 F.4th 1321 (7th Cir. 2022) ....................................................................... 14

*Long v. Brown*,
    2015 WL 4162809 (S.D. Ind. July 9, 2015) .................................................. 14

*Mazurek v. Armstrong*,
    520 U.S. 968 (1997) ...................................................................................... 13

*Michigan v. U.S. Army Corps of Eng'rs*,
    667 F.3d 765 (7th Cir. 2011) ........................................................................ 14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ........................................................................................ 22

*NCTA v. Brand X Internet Serv.*,
    545 U.S. 967 (2005) ...................................................................................... 22

*Orr v. Shicker*,
    953 F.3d 490 (7th Cir. 2020) ........................................................................ 13

*Preston v. Bd. of Trustees of Chi. State Univ.*,
    120 F. Supp. 3d 801 (N.D. Ill. 2015) ........................................................... 14

*S. Ute Indian Tribe v. Dep't of the Interior*,
    2015 WL 3862534 (D. Colo. Jun. 22, 2015) ................................................ 14

*Sebelius v. Auburn Reg'l Med. Ctr.*,
    568 U.S. 145 (2013) ...................................................................................... 22

*Sw. Elec. Power Co. v. EPA*,
    920 F.3d 999 (5th Cir. 2019) ........................................................................ 29

*Troogstad v. City of Chicago*,
    571 F. Supp. 3d 901 (N.D. Ill. 2021) ........................................................... 13

*United States v. Mead Corp.*,
    533 U.S. 218–27 (2001) ................................................................................ 22

iv

*Univ. of Notre Dame v. Sebelius,*
   743 F.3d 547 (7th Cir. 2014) ................................................................. 14

*Varity Corp v. Howe,*
   516 U.S. 489 (1996) ........................................................................... 21

*W&T Offshore, Inc. v. Bernhardt,*
   946 F.3d 227 (5th Cir. 2019) ............................................................... 22

*Winter v. Nat. Res. Def. Council,*
   555 U.S. 7 (2008) ......................................................................... 13, 14

## United States Code

29 U.S.C. § 1001 ..................................................................................... 3, 4

29 U.S.C. § 1104 ......................................................................... 4, 17, 19, 20

29 U.S.C. § 1106 ......................................................................................... 19

29 U.S.C. § 1135 ..................................................................................... 4, 17

## Regulations, Sub-Regulatory Guidance, and Executive Orders

29 C.F.R. § 2550.404a–1 ................................................................... *passim*

29 C.F.R. § 2550.404c–5 ............................................................................ 7

44 Fed. Reg. 1065 (Jan. 3, 1979) ............................................................... 4

59 Fed. Reg. 32606 (Jun. 23, 1994) .......................................................... 5

73 Fed. Reg. 61734 (Oct. 17, 2008) .......................................................... 5

80 Fed. Reg. 65135 (Oct. 26, 2015) ....................................................... 5, 6

85 Fed. Reg. 72846 (Nov. 13, 2020) ................................................ *passim*

85 Fed. Reg. 81658 (Dec. 16, 2020) ......................................................... 6

86 Fed. Reg. 7037 (Jan. 20, 2021) ......................................................... 7, 8

86 Fed. Reg. 27967 (May 25, 2021) .......................................................... 9

86 Fed. Reg. 57272 (Oct. 14, 2021) ..................................................... 9, 10

87 Fed. Reg. 73822 (Dec. 1, 2022) ................................................... *passim*

## Restatement of the Law

*Restatement (Third) of Trusts*
   § 78 (2007) .................................................................................... 21

**Other Authorities**

DOL Stmt. re: Enforcement,
    https://perma.cc/W6SR-J534 (March 10, 2021) ................................................................. 8

Fact Sheet,
    https://perma.cc/3WAW-PZ26 (Jan. 20, 2021) .................................................................. 8

Field Assistance Bulletin (FAB) 2018–01 at 2,
    https://perma.cc/HCS2-JBMR (Apr. 23, 2018) ................................................................. 5

Summary, H.J. Res. 30,
    https://www.congress.gov/bill/118th-congress/house-joint-resolution/30 (last visited Mar. 28,
    2023) .................................................................................................................................. 12

Veto Message, H.J. Res. 30,
    https://perma.cc/YJW5-HDVF (Mar. 20, 2023) ........................................................... 12

# INTRODUCTION

Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA) to protect the financial stability and hard-earned retirement savings of working Americans. The Department of Labor (DOL or Department) has long been charged with promulgating regulations to carry out the statute in furtherance of these goals. The Rule challenged here supports Congress's aims by rescinding two rules that risked discouraging plan fiduciaries from selecting investments that might be in the best financial interests of plan participants and beneficiaries. Those prior rules created a chilling effect on fiduciaries' consideration of the economic effects of environmental, social, and governance (ESG) factors—even where such factors were material to financial performance. The current Rule removes this thumb on the scale against consideration of ESG factors and confirms fiduciaries' ability to consider any factor they reasonably conclude is relevant to a risk and return analysis. *See* Final Rule, Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights, 87 Fed. Reg. 73822 (Dec. 1, 2022) (Investment Duties Rule or Rule). In doing so, the Rule places ERISA plan participants and beneficiaries on equal footing with other market participants by allowing them to take advantage of economic opportunities presented by, and protect against economic risks posed by, ESG factors. Critically, however, the Rule does not *require* fiduciaries to take ESG factors into account where they prudently decide not to—and it certainly does not mandate ESG investing.

The Rule also reaffirms, consistent with ERISA's statutory text, that fiduciaries' exclusive purpose must be to secure financial benefits for plan participants and beneficiaries, and that this purpose may never be subordinated to unrelated goals. Consistent with this requirement, the Rule restates the Department's position—which has remained unswerving for nearly three decades, across five presidential administrations, and even in the rules it rescinds—that where two investment courses of action are economically equivalent, ERISA does not instruct fiduciaries as to how to choose between them, and so a fiduciary may look to collateral benefits in deciding how to break the tie. The

1

tiebreaker standard explicitly prohibits fiduciaries from considering collateral benefits other than investment returns in selecting investments *except* where the competing options equally serve the financial interests of the plan; it expressly forbids fiduciaries from sacrificing investment return or taking on additional risk to promote collateral goals. The updated regulation further eliminates onerous paperwork requirements that risked discouraging fiduciaries from making certain types of economically prudent investments, including those based on a consideration of the economic effects of other ESG factors, or exercising shareholder rights in certain ways, even where they serve the financial interests of participants and beneficiaries.

This lawsuit rests on a false premise that the Rule permits fiduciaries to pursue non-financial goals in violation of their statutory duties under ERISA. Not so. A proper reading of the Rule reveals this lawsuit to be a thinly veiled attempt to roll back the Rule's placement of the economic effects of ESG considerations on an equal footing with other risk-return factors. In that regard, Plaintiffs cannot meet their burden to obtain the extraordinary remedy they seek here. At the outset, Plaintiffs cannot demonstrate irreparable harm. Plaintiffs' alleged harm is entirely speculative, and any alleged harm to Plaintiffs caused by fiduciaries' independent exercise of their statutory duties in selecting investments is not attributable to DOL. Moreover, Plaintiffs' unexplained delay in seeking emergency injunctive relief—a full three months after the Rule was signed, and nearly a month after its effective date—demonstrates that immediate relief is unnecessary.

Plaintiffs also are unlikely to succeed on the merits. The majority of their arguments amount to policy disagreements with DOL's conclusions, or with ESG investing in general. But it is not appropriate for Plaintiffs to ask this Court to substitute its judgment for that of the agency, and it is factually incorrect to suggest that the Rule somehow requires fiduciaries to choose (or even consider) ESG-focused investments. Agency action complies with the Administrative Procedure Act (APA) where an agency acts within its statutory authority and its choices are the product of a reasoned

process, reflecting the appropriate consideration of alternatives and of all important aspects of the problem at issue. That is the case here. The Department was authorized to promulgate the Rule by a broad and deliberate delegation of rulemaking authority with respect to ERISA and is in harmony with ERISA's plain language. The Rule addresses an area that DOL has regulated for over forty years and is consistent with the Department's longstanding positions that ESG factors may be proper economic considerations in a risk and return analysis and that collateral benefits may be used as a tiebreaker only where necessary to select amongst competing investments that are economically equivalent. The Rule is thus within DOL's congressionally delegated authority and is neither arbitrary nor capricious.

Finally, the public interest weighs heavily in the government's favor. The Rule protects ERISA plan participants and beneficiaries' retirement savings by confirming that fiduciaries' investment selections must be for the exclusive purpose of providing financial benefits to plan participants and beneficiaries, and by clarifying that they may consider all appropriate factors relevant to a risk-return analysis in selecting investments.

The request for a temporary restraining order and a preliminary injunction should be denied.

## BACKGROUND

### I. Statutory Framework

Congress enacted ERISA in 1974 "to protect . . . the interests of participants in employee benefit plans and their beneficiaries," finding that such plans were vital to "the continued well-being and security of millions of employees" and "an important factor affecting the stability of employment." 29 U.S.C. § 1001(a), (b). Accordingly, Congress created requirements for "disclosure and reporting to participants and beneficiaries," established "standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans," and provided plan participants and beneficiaries with remedies for any violation of these requirements. *Id.* § 1001(b). ERISA "establishes minimum

standards that govern the operation of private-sector employee benefit plans." 87 Fed. Reg. at 73822.

As relevant here, section 404 of the Act codified ERISA fiduciaries' duties of loyalty and prudence to plan participants and beneficiaries. *See* 29 U.S.C. § 1104. The statute requires a fiduciary to "discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries," and "for the exclusive purpose of providing benefits to participants and their beneficiaries." *Id.* § 1104(a)(1). Fiduciaries are further obligated to act with the "skill, care, prudence, and diligence under the circumstances then prevailing" of a prudent person. *Id.* § 1104(a)(1)(B).

To further the goals of ERISA, Congress delegated to the Secretary of Labor broad authority to promulgate "such regulations as he finds necessary or appropriate" and "to carry out" certain provisions of the Act, including its fiduciary duty requirements. *Id.* § 1135. The statute does not further constrain the Secretary's authority, but recognizes that "among other things," such regulations may define terms, prescribe forms, or provide for record keeping or inspection. *Id.*

## II.  Regulatory Background

The Department first promulgated a version of the Investment Duties regulation at issue here in 1979. *See* 87 Fed. Reg. at 73839; *see also* 44 Fed. Reg. 1065 (Jan. 3, 1979). That regulation remained unchanged for over forty years; during this time DOL issued sub-regulatory guidance to provide additional interpretation of fiduciary duties under ERISA. *See* 87 Fed. Reg. at 73823–25.

### A.  Pre-2020 Sub-Regulatory Guidance

DOL has, for nearly three decades, taken the position that ERISA's obligations of prudence and loyalty do not forbid the consideration of collateral, non-financial benefits in selecting between where the competing investments "that serve the plan's economic interests equally." 87 Fed. Reg. at 73824. This test, first introduced in sub-regulatory guidance in Interpretive Bulletin (IB) 1994–01, has been colloquially referred to as the "tiebreaker" standard. *See* IB 94–1, 59 Fed. Reg. 32606 (Jun. 23,

1994).[1]  The tiebreaker is permitted only where the selected investment has "an expected rate of return at least commensurate to rates of return of available alternative investments" (with similar risks) and otherwise comport with factors like "diversification" and "the investment policy of the plan."  87 Fed. Reg. at 73824.  IB 2008–01 maintained that the tiebreaker standard did not conflict with ERISA's plain text.  This is because where "two or more investment alternatives are of equal economic value to a plan," "ERISA does not itself specifically provide a basis for making the investment choice" and "the economic interests of the plan are fully protected" by the fact that the alternatives are economically equivalent.  IB 2008–01, 73 Fed. Reg. 61734, 61735 (Oct. 17, 2008).  IB 2015–01 likewise advised that the use of the tiebreaker standard was consistent with the fiduciary duties of prudence and loyalty and with ERISA's exclusive purpose provision.  *See* IB 2015–01, 80 Fed. Reg. 65135, 65136 (Oct. 26, 2015).  Thus, DOL has steadfastly maintained, for at least thirty years, that ERISA fiduciaries may consider collateral benefits as a tiebreaker.

The Department has also specifically recognized that fiduciaries' prudent determination that an investment is appropriate based solely on economic factors may include the consideration of "[e]nvironmental, social, and governance issues" that "have a direct relationship to the economic value of the plan's investment."  *See* IB 2015–01, 80 Fed. Reg. at 65136; *see also* Field Assistance Bulletin (FAB) 2018–01 at 2, https://perma.cc/HCS2-JBMR (Apr. 23, 2018) ("otherwise collateral ESG issues" could "present material business risk or opportunities" and in such situations "should be considered by a prudent fiduciary along with other relevant economic factors").  IB 2015–01 explained that where ESG issues themselves present economic considerations, they "are not merely collateral considerations or tie-breakers," but rather "proper components of the fiduciary's primary analysis of

---

[1] Even before the issuance of IB 94–1, DOL issued a number of advisory opinions and letters reaching the same conclusion: that fiduciaries could take into account factors not related to investment return, but only if the financial prospects of the selected investments were "equal or superior to alternative available investments."  *See* 59 Fed. Reg. at 32606–07; *see also* 87 Fed. Reg. at 73824 n.18.

the economic merits." 80 Fed. Reg. at 65136. In recognizing that ESG factors could, where appropriate, be treated as relevant economic considerations, DOL emphasized the need to "always put first the economic interests of the plan." *Id.*

## B. The 2020 Rules

In 2020, the Department issued two new rules via notice-and-comment rulemaking that removed prior sub-regulatory guidance from the Code of Federal Regulations and amended the Department's Investment Duties regulation for the first time since its adoption in 1979. *See* 87 Fed. Reg. at 73823. The first rule primarily concerned the consideration of ESG factors in selecting investments; the second concerned proxy voting and other exercises of shareholder rights. *See id.*; *see also* Final Rule, Financial Factors in Selecting Plan Investments, 85 Fed. Reg. 72846 (Nov. 13, 2020) (2020 Investment Duties Rule); Final Rule, Fiduciary Duties Regarding Proxy Voting and Shareholder Rights, 85 Fed. Reg. 81658 (Dec. 16, 2020) (2020 Proxy Voting Rule) (collectively, the 2020 Rules).

The 2020 Investment Duties Rule amended DOL's Investment Duties regulation in several ways. Among other things, it required plan fiduciaries to choose investments and investment courses of action based solely on consideration of "pecuniary factors"—a term not used in ERISA. *See* 87 Fed. Reg. at 73823; *see also* 85 Fed. Reg. at 72884. The revised regulation retained the tiebreaker test, acknowledging that fiduciaries could properly consider collateral factors in breaking a tie. *See* 85 Fed. Reg. at 72862. But it stated that the tiebreaker was available only where fiduciaries were "unable to distinguish" among investments "on the basis of pecuniary factors alone" and imposed novel specific documentation requirements any time a fiduciary utilized it. *See id.* at 72884. It also, for the first time, prohibited adding or retaining as a qualified designated investment alternative (QDIA)[2] any investment fund, product, or model portfolio that "includes even one non-pecuniary objective in its investment

---

[2] A QDIA is a default investment selection made "in the absence of an investment election by the participant." *See* 29 C.F.R. § 2550.404c–5(a)(1).

objectives or principal investment strategies." 87 Fed. Reg. at 73823; *see also* 85 Fed. Reg. at 72884. The preamble tied these changes to ESG investing, stating that "ESG investing raises heightened concerns under ERISA," based on the perception that it "may prompt ERISA fiduciaries to make investment decisions for purposes distinct from providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan." *Id.* at 72848. It recognized, however, "that there are instances where one or more [ESG] factors will present an economic business risk or opportunity" that fiduciaries "would appropriately treat as material economic considerations." *Id.*

The 2020 Proxy Voting Rule implemented several other changes to the Investment Duties regulation. Among other things, it stated that ERISA fiduciaries are not required to "vote[] every proxy or exercise[] every shareholder right." 85 Fed. Reg. at 81694. As part of the rationale, the preamble explained that it was "likely" that "many" proxies "related to environmental, social, or public policy agendas" have "little bearing on share value or other relation to plan financial interests." *Id.* at 81681. The 2020 Proxy Voting Rule also imposed specific monitoring and recordkeeping requirements with respect to proxy voting and other exercises of shareholder rights. *Id.* at 81694.

## C. Executive Orders and Stakeholder Outreach

Shortly after the promulgation of the 2020 Rules—eight days after the effective date of the 2020 Investment Duties Rule and five days after the effective date of the 2020 Proxy Voting Rule— President Biden issued Executive Order (E.O.) 13990, which recognized the Nation's "abiding commitment to empower our workers and communities" and to "protect our public health and the environment." E.O. 13990, 86 Fed. Reg. 7037, 7073 (Jan. 20, 2021). In light of the administration's priorities, including "to bolster resistance to the impact of climate change," the E.O. directed all federal agencies to review regulations promulgated between January 20, 2017 and January 20, 2021 that might be inconsistent with these goals and, "as appropriate and consistent with applicable law," to consider

whether to suspend, revise, or modify those agency actions.[3] *Id.*

The Department accordingly conducted outreach to, and heard feedback from, "a wide variety of stakeholders," including "asset managers, labor organizations, and other plan sponsors, consumer groups, service providers, and investment advisors" regarding the 2020 Rules. 87 Fed. Reg. at 73823 n.13, 73825–26. These stakeholders questioned whether the 2020 Rules properly reflected fiduciary duties of prudence and loyalty. *See id.* They also questioned whether the 2020 Rules adequately addressed the "substantial evidence submitted by public commenters" about the use of ESG considerations "improving investment value and long-term investment returns for retirement investors," as well as whether the 2020 Rules were "rushed." *See id.* at 73825. The 2020 Rules were reportedly creating "confusion" among investors about "whether climate change and other ESG factors may be treated as 'pecuniary' factors." *Id.* This was, in the eyes of stakeholders, creating a "chilling effect" on "appropriate integration of climate change and other ESG factors in investment decisions." *Id.* Stakeholders feared that the 2020 Rules placed "a thumb on the scale against the consideration of ESG factors"—"even when those factors are financially material." *Id.* at 73826.

After hearing some of this feedback, DOL announced that it intended to revisit the 2020 Rules and, during that reconsideration process, would not enforce the 2020 Rules. *See* DOL Stmt. re: Enforcement, https://perma.cc/W6SR-J534 (March 10, 2021). DOL also continued to conduct stakeholder outreach about the impact of the 2020 Rules. *See* 87 Fed. Reg. at 73823. Stakeholders reported that the chilling effect on proper consideration of ESG factors persisted in the non-enforcement period, "including in circumstances where the current regulation may in fact allow [such] consideration." *Id.* at 73825–26.

A few months after DOL's non-enforcement statement, the President signed E.O. 14030,

---

[3] A Fact Sheet issued simultaneously with E.O. 13990 stated that DOL was to undertake a review of the 2020 Investment Duties Rule. *See* Fact Sheet, https://perma.cc/3WAW-PZ26 (Jan. 20, 2021).

which recognized the financial risks created by the "intensifying impacts of climate change" and the "global shift away from carbon-intensive energy sources and industrial processes," along with the opportunities presented by this "generational shift" to "enhance U.S. competitiveness and economic growth." E.O. 14030, 86 Fed. Reg. 27967 (May 25, 2021). The E.O. warned that failure to appropriately account for these physical and transition risks "threatens . . . the life savings and pensions of U.S. workers and families." *Id.* Accordingly, the E.O. directed DOL to "consider publishing, by September 2021, . . . a proposed rule to suspend, revise, or rescind" the 2020 Rules. *Id.* at 27968–69.

### D. The Investment Duties NPRM and Final Rule

On October 14, 2021, the Department issued a notice of proposed rulemaking (NPRM) that proposed several changes and clarifications to the Investment Duties regulation as modified by the 2020 Rules. *See generally* Proposed Rule, Prudence and Loyalty in Selecting Plan Investments and Exercising Shareholder Rights, 86 Fed. Reg. 57272 (Oct. 14, 2021) (the Investment Duties NPRM). The NPRM noted that, although the 2020 regulation did not ultimately include explicit references to ESG investing, the preambles to the 2020 Rules "appeared to express skepticism about fiduciaries' reliance on ESG considerations." *Id.* at 57275. Stakeholder feedback demonstrated that the regulation as modified had created a chilling effect on the proper consideration of ESG factors in investment decisions and could "deter fiduciaries from taking steps that other marketplace investors would take in enhancing investment value and performance, or improving investment portfolio resilience against the potential financial risks and impacts often associated with climate change and other ESG factors." *Id.* The NPRM included an extended discussion of reports and studies describing the extent to which climate change and other ESG factors may present material financial risks and opportunities for companies and investors. *See id.* at 57289–92. The Department was also concerned that the regulation "ha[d] created a perception that fiduciaries are at risk if they include any ESG factors in the financial evaluation of plan investments." *Id.* at 57275–76. The proposed rule was intended to address these

uncertainties "relating to the consideration of ESG issues" to "help safeguard the interests of participants and beneficiaries." *Id.* at 57276.

Consistent with this purpose, the NPRM proposed several changes and clarifications to the Investment Duties regulation, including, as relevant here: adding language that the duty of prudence "may often require an evaluation of the economic effects of climate change and other ESG factors"; adding to the regulation examples of climate change and ESG factors that may be material; modifying the tiebreaker test and removing special document requirements "in favor of ERISA's generally applicable statutory duty to prudently document plan affairs"; implementing a disclosure requirement as to the collateral benefits used in the tiebreaker test; and removing special rules that applied to the selection of QDIAs. *See* 87 Fed. Reg. at 73826–27. During a sixty-day comment period, the Department received more than 895 written comments and 21,469 form petitions regarding these and other proposals. *Id.* at 73827.

The Investment Duties Rule, issued on November 21, 2022, responds to these comments and adopts some, but not all, of the proposals in the NPRM, with the goal of restoring longstanding ERISA standards and clarifying that fiduciaries may consider ESG factors in selecting investments or other investment courses of action where appropriate and consistent with their fiduciary duties. At the same time, the Rule leaves unchanged much of the original 1979 regulation, including the overarching requirement that ERISA fiduciaries must undertake their duties "solely in the interests of the participants and beneficiaries," and "for the exclusive purpose of providing benefits to participants and their beneficiaries." 87 Fed. Reg. at 73884.

First, as relevant here, the Rule modifies several proposals in the NPRM to avoid creating the misperception that the Department was favoring ESG investment strategies over fiduciaries' considered judgment. It replaces the proposed language that risk and return factors "may often require" a consideration of the economic effects of climate change and other ESG factors with the

10

observation that risk and return factors "may include the economic effects of climate change and other [ESG] factors." *Id.* at 73829–31, 73885. It also specifies that what constitutes a risk-return factor depends on individual facts and circumstances, and that fiduciaries' determinations should "appropriately reflect a reasonable assessment of [any factor's] impact on risk-return." *Id.* at 73885. In addition, the Rule does not adopt the proposal to add examples of ESG factors to the regulation, which commenters observed might be incorrectly interpreted as "creating an apparent regulatory bias in favor of particular investments or investment strategies." *Id.* at 73831–32. The preamble states clearly that fiduciaries "remain[] free under the final rule to determine that an ESG-focused investment is *not* in fact prudent," *id.* at 73831, and that fiduciaries are *not* "required to consider ESG factors when making all investment decisions," *id.* at 73879.

Second, the Rule modifies the tiebreaker test in a manner consistent with longstanding sub-regulatory guidance. The regulation now defines the test to permit the consideration of collateral benefits where competing investments "equally serve the financial interests of the plan over the appropriate time horizon." *Id.* at 73885. This language replaced the requirement that the tiebreaker apply only where investments are indistinguishable "on the basis of pecuniary factors alone," which commenters found confusing and difficult to apply. *Id.* at 73835–37. As the Rule points out, the tiebreaker standard is useful because "ERISA does not specifically address" situations where "multiple investment alternatives equally serve the financial interests of the plan." *Id.* at 73836. The Rule acknowledges that some fiduciaries may never need to use a tiebreaker, but observes that the test is beneficial where, for example, "there are equally strong cases for competing investments under a risk-return analysis," and choosing among them would ensure that the plan is not incurring additional "transactional or monitoring costs" from selecting two or more investments that could "offset the benefits of investing." *Id.* The Rule makes plain that "[f]iduciaries without a need to break a tie while selecting investments need not use the provision," and that "there is nothing in the regulation that

requires fiduciaries to look to climate change or other ESG factors to break the tie." *Id.* at 73836.

Third, the Rule eliminates the novel specific documentation requirement regarding the tiebreaker added in the 2020 Rule, *see id.* at 73885, which commenters noted would chill fiduciaries from utilizing the test at all—even where necessary. *Id.* at 73837–38. For similar reasons, the Department decided not to adopt proposed collateral benefit disclosure requirements where fiduciaries appropriately utilize the tiebreaker test. *Id.* at 73839. But DOL emphasized that these decisions do not alter "a fiduciary's duty to prudently document . . . tiebreaking decisions in accordance with section 404 of ERISA." *Id.* at 73841.

Finally, the Rule removes special requirements regarding the selection of QDIAs. This change was "overwhelmingly" supported by commenters, who felt that these additional requirements "effectively preclude[d] fiduciaries from considering QDIAs that include ESG strategies, even where they were otherwise prudent or economically superior to competing options." *Id.* at 73842–43.

The majority of the Rule had an effective date of January 30, 2023.[4] *See id.* at 73886.

### III. Procedural History

Three months after the Rule was signed, and nearly a month after its effective date, on February 21, 2023, Plaintiffs sued the Secretary of Labor under the APA, alleging that the Rule exceeds DOL's statutory authority under ERISA and is arbitrary and capricious. Compl., ECF No. 1. A week later, Plaintiffs moved for a preliminary injunction and a temporary restraining order. *See* ECF No. 8.

---

[4] On March 1, 2023, Congress passed a joint resolution disapproving of the Investment Duties Rule pursuant to the Congressional Review Act. *See* H.J. Res. 30. The President vetoed the resolution, explaining that the Rule "allows retirement plan fiduciaries to make fully formed investment decisions by considering all relevant factors that might impact a prospective investment, while ensuring that investment decisions made by retirement plan fiduciaries maximize financial returns for retirees." Veto Message, H.J. Res. 30, https://perma.cc/YJW5-HDVF (Mar. 20, 2023). Congress failed to override the veto. *See* Summary, H.J. Res. 30, https://www.congress.gov/bill/118th-congress/house-joint-resolution/30 (last visited Mar. 28, 2023).

## ARGUMENT

### I. The Extraordinary Remedy of a Preliminary Injunction Is Not Warranted Here.

As the Seventh Circuit has "repeatedly" stated, "a temporary restraining order or a preliminary injunction is 'an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it.'" *Troogstad v. City of Chicago*, 571 F. Supp. 3d 901, 907 (N.D. Ill. 2021) (quoting *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020)). Such an "extraordinary and drastic remedy . . . should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The party seeking a preliminary injunction must establish: (1) "that he is likely to suffer irreparable harm in the absence of preliminary relief"; (2) "that he is likely to succeed on the merits"; (3) "that the balance of equities tips in his favor"; and (4) "that an injunction is in the public interest." *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).

If the plaintiff fails to meet any of the "threshold requirements"—which the Seventh Circuit considers to be "likelihood of success on the merits," "no adequate remedy at law," and "irreparable harm"—the court "must deny the injunction." *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). Where the movant establishes the threshold requirements, the Seventh Circuit "employs a sliding scale approach" that counsels that "if a plaintiff is more likely to win, the balance of harms can weigh less heavily in its favor, but the less likely a plaintiff is to win the more that balance would need to weigh in its favor." *Id.* (citation omitted). If a plaintiff cannot show a likelihood of success, "there [is] no need for the district court to conduct further analysis." *Id.* at 367–68.

### A. Plaintiffs Have Not Shown Irreparable Harm.

"A sine qua non for [preliminary] relief is proof of irreparable harm if the injunction is denied." *Univ. of Notre Dame v. Sebelius*, 743 F.3d 547, 553 (7th Cir. 2014). A plaintiff "seeking preliminary relief [must] demonstrate that irreparable injury is *likely*," not merely possible, "in the absence of an

injunction." *Winter*, 555 U.S. at 22. The threat of irreparable harm must also be "imminent." *Bedrossian v. Nw. Memorial Hosp.*, 409 F.3d 840, 844 (7th Cir. 2005). "[S]peculative" allegations of harm are not "irreparable" and thus do not "warrant the extraordinary remedy of preliminary injunctive relief." *Halczenko v. Ascension Health, Inc*, 37 F.4th 1321, 1325 (7th Cir. 2022). In addition, unexplained delay in seeking such relief calls into question "how urgent the need for [preliminary] equitable relief really is." *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 788 (7th Cir. 2011); *see also Preston v. Bd. of Trustees of Chi. State Univ.*, 120 F. Supp. 3d 801, 805 (N.D. Ill. 2015) ("delay in seeking injunctive relief is circumstantial evidence that the potential harm . . . is not irreparable or as great as claimed" (citation omitted)). Multiple courts have found that the failure to challenge a final rule promptly following its promulgation, and sufficiently in advance of its effective date, undercut a finding of irreparable harm. *See, e.g.*, *AARP v. EEOC*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016); *S. Ute Indian Tribe v. Dep't of the Interior*, 2015 WL 3862534, at *1 (D. Colo. Jun. 22, 2015).

Plaintiffs' unexplained delay in seeking relief here alone demonstrates a lack of irreparable harm. Plaintiffs did not file suit until February 21, 2023—a full three months after the Investment Duties Rule was signed on November 21, 2022, and nearly a month after its effective date of January 30, 2023. *See* 87 Fed. Reg. at 73886. They waited another week to file their motion for a temporary restraining order and a preliminary injunction. Plaintiffs had ample notice as to what the Rule might contain, given that the NPRM was issued more than a year before the Rule's issuance. Plaintiffs thus could have easily sought an injunction before the Rule's effective date. Now, however, the new regulation has been in effect for months, and this request for preliminary relief would "alter the status quo'" and thus would "not serve the purposes a preliminary injunction is intended to protect." *Long v. Brown*, 2015 WL 4162809, at *1 (S.D. Ind. July 9, 2015); *see also Anglo-American Inv. Trust, Ltd. v. Pearson*, 294 F. Supp. 1150, 1153 (E.D. Wis. 1969) (declining to grant a preliminary injunction that "would alter the status quo"). Plaintiffs' delay in challenging the Rule and their request

to upend the status quo are sufficient to find a lack of irreparable harm and deny the motion.

Even if the Court were to move past Plaintiffs' delay, their various alleged harms are speculative, remote, and not attributable to the Rule. Plaintiffs' own arguments make the hypothetical nature of their alleged harms clear: they assert that their retirement accounts "*could* . . . be invested in funds that *may* . . . lead to financial losses" and that the Rule allegedly "gives cover to *potential* breaches of fiduciary duty."[5] Mot. 22 (emphases added). But by Plaintiffs' own account, these purported injuries would occur only if fiduciaries made the decision to invest these particular Plaintiffs' retirement funds in investments that later incurred financial losses, or to breach their fiduciary duties by either imprudently selecting investments or failing to appropriately document plan affairs.

Any such future injury is unlikely and cannot be attributed to the Department. Theories of injury that "rest on speculation about the decisions of independent actors" are insufficient to demonstrate standing, let alone irreparable harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409, 414 (2013). The Rule states over and over that fiduciaries' investment decisions are subject to the duties of prudence and loyalty, and that the Rule does not require fiduciaries to select ESG-focused investments. *See, e.g.*, 87 Fed. Reg. at 73831 ("A fiduciary . . . remains free under the final rule to determine that an ESG-focused investment is *not* in fact prudent."); *id.* at 73842 ("the selection of investment options must be grounded in the fiduciary's prudent risk and return analysis"); *id.* at 73854 ("The final rule does not require fiduciaries to consider ESG factors . . . ."). The Rule expressly avoids putting a thumb on the scale in favor of or against any type of investment. *See id.* at 73831. And although the regulation recognizes that "[r]isk and return factors may include the economic effects of

---

[5] Plaintiffs also assert that their cursory claim that the Rule "violates the constitutional separation of powers," Mot. 22, in and of itself demonstrates irreparable harm, *id.* at 26. But they have not demonstrated a constitutional violation. *See infra* p. 27 n.6. In any event, although "irreparable harm is presumed" for "some kinds of constitutional violations"—like alleged First or Second Amendment violations—the Seventh Circuit has not extended this presumption to alleged violations based on the structural separation of powers. *See Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011).

15

climate change and other [ESG] factors," it leaves to fiduciaries to prudently determine when that is the case. 29 C.F.R. § 2550.404a–1(b)(4). Investment selections, and their results, are thus solely attributable to fiduciaries. Fiduciaries also remain subject to their duty "to prudently document . . . tiebreaking decisions in accordance with section 404 of ERISA." 87 Fed. Reg. at 73841.

What is more, Plaintiffs' financial interests in their retirement plans are amply protected by the current regulation. Consistent with ERISA, the regulation requires that fiduciaries act "solely in the interests of the participants and beneficiaries," and "for the exclusive purpose of providing benefits to participants and their beneficiaries." 29 C.F.R. § 2550.404a–1(a). It mandates that investment selections be based on factors that "are relevant to a risk and return analysis," *id.* § 2550.404a–1(b)(4); instructs that "[a] fiduciary may not subordinate the interests of participants and beneficiaries in their retirement income or financial benefits under the plan to other objectives"; and forbids fiduciaries from "sacrific[ing] investment return or tak[ing] on additional risk to promote [unrelated] benefits or goals," *id.* § 2550.404a–1(c)(1). Only where fiduciaries "prudently conclude[]" that investments "equally serve the financial interests of the plan over the appropriate time horizon" may they consider "collateral benefits other than investment returns" as part of a tiebreaker. *Id.* § 2550.404a–1(c)(2). But fiduciaries *cannot* "accept expected reduced returns or greater risks to secure such additional benefits." *Id.*

For all of these reasons, Plaintiffs have not met their burden to show irreparable harm.

**B. Plaintiffs Have Not Demonstrated a Substantial Likelihood of Success on the Merits.**

Plaintiffs argue that DOL acted in excess of its statutory authority by providing clarity regarding fiduciaries' ability to consider the economic effects of ESG factors where appropriate, by modifying the novel version of the tiebreaker introduced in the 2020 Investment Duties Rule to align with the Department's longstanding sub-regulatory guidance, and by removing new documentation requirements that imposed additional costs with no benefits to plan participants. *See* Mot. 8–19. They

also appear to contend that these same determinations were arbitrary and capricious. *See id.* at 20. All of these arguments fail.

### 1. The Rule Falls Within DOL's Statutory Authority.

#### a. The Rule is within DOL's broad regulatory authority to carry out ERISA.

The 2022 Investment Duties Rule is squarely within DOL's regulatory power to carry out ERISA and entirely consistent with the Act's statutory language. Congress delegated authority to the Department to prescribe regulations under ERISA in a manner that gives it broad flexibility by empowering the Secretary to "prescribe such regulations as he finds necessary or appropriate to carry out the [relevant] provisions" of ERISA. 29 U.S.C. § 1135. Congress's use of the phrase "such regulations as he finds necessary" shows that it intended to defer to agency expertise, as "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion." *City of Arlington, Tx. v. FCC*, 569 U.S. 290, 296 (2013). In an exercise of this discretion, DOL promulgated a regulation that assists fiduciaries in interpreting the gap in ERISA's statutory language and that is consistent with the Department's longstanding positions.

ERISA section 404 provides, in relevant part, that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries," and "for the exclusive purpose of providing benefits to the participants and their beneficiaries" while "defraying reasonable costs of the plan." 29 U.S.C. § 1104(a)(1). The Rule restates this language, *see* 29 C.F.R. § 2550.404a–1(a), and elaborates upon it. It forbids fiduciaries from "subordinat[ing] the interests of the participants and beneficiaries in their retirement income or financial benefits . . . to other objectives," or from "sacrific[ing] investment return or tak[ing] on additional risk to promote goals unrelated to the interests of the participants and beneficiaries in their plans." 29 C.F.R. § 2550.404a–1(c)(1). It also prohibits fiduciaries from "accept[ing] expected reduced returns or greater risks to secure [collateral] benefits." *Id.* § 2550.404a–1(c)(2). The Rule thus perpetuates the letter and spirit of

section 404 by making plain that plan participants' financial interests must be paramount.

Consistent with this goal and with section 404, the Rule clarifies that "climate change and other ESG factors may be relevant in a risk-return analysis of an investment and do not need to be treated differently than other relevant investment factors." 87 Fed. Reg. at 73830; *see also* 29 C.F.R. § 2550.404a–1(b)(4) ("Risk and return factors may include the economic effects of climate change and other environmental, social, or governance factors on the particular investment . . . ."). The Department has taken this position in sub-regulatory guidance since 2015, *see supra* pp. 5–6, and reaffirmed it in the preamble to the 2020 Investment Duties Rule, *see* 85 Fed. Reg. at 72848 ("there are instances where one or more environmental, social, or governance factors will present an economic business risk or opportunity" that fiduciaries "would appropriately treat as material economic considerations"). The preamble to the 2020 Rule also, however, contained language that created a chilling effect on considering ESG factors in an economic analysis. *See* 87 Fed. Reg. at 73826. But DOL has recognized that participants and beneficiaries could suffer financial harm if fiduciaries were deterred from considering ESG factors "when they are relevant to a risk-return analysis." *Id.* at 73831. Under those circumstances, fiduciaries would refrain from "taking steps that other marketplace investors take in enhancing investment value and performance or improving investment portfolio resilience" to plan participants' detriment. *Id.* at 73826. The Rule seeks to prevent this harm, and reverse the chilling effect of the 2020 Rule, by explaining that fiduciaries may, where appropriate, consider the "economic effects" of ESG factors in a risk-return analysis—and not on the basis of collateral benefits. In doing so, the Department makes clear that fiduciaries should "exercise discretion in determining, in light of the surrounding facts and circumstances, the relevance of any factor to a risk-return analysis," and "remain[] free . . . to determine that an ESG-focused investment is *not* in fact prudent." *Id.* at 73831.

The Rule also recognizes what section 404's text does *not* address: a situation in which a

18

fiduciary is presented with two investment courses of action that are economically equivalent. In that circumstance, the fiduciary's duty to act "for the exclusive purpose of providing benefits" to plan participants does not provide the answer as to which of two equivalent investments to select; each is equally beneficial from an economic perspective. *See* 87 Fed. Reg. at 73836. Acknowledging this gap in the statute, DOL has, for nearly three decades and across five presidential administrations, including in the 2020 Rule, advised fiduciaries that ERISA does not prohibit looking to collateral benefits where competing investment alternatives are equally beneficial financially. *See supra* pp. 4–6. During this time, except for during the brief period in which the unprecedented documentation requirement in the 2020 Rule was in place, ERISA's prudence obligations successfully governed "the fiduciary's duty to document an investment decision." *See* 87 Fed. Reg. at 73838.

The Rule continues this long history by explaining that where "a fiduciary prudently concludes that competing investments, or competing courses of action, equally serve the financial interests of the plan over the appropriate time horizon," that fiduciary "is not prohibited from" selecting one of the competing investments "based on collateral benefits other than investment returns." 29 C.F.R. § 2550.404a–1(c)(2). Also consistent with longstanding practice, the Rule relies upon the duty of prudence to guide fiduciaries' duty to document investment decisions. *See* 87 Fed. Reg. at 73838. When applying the tiebreaker, the fiduciary must act in accordance with the duties of prudence and loyalty, *see* 29 U.S.C. § 1104(a), and cannot engage in prohibited transactions, *see id.* § 1106. The need to break a tie may never arise for some fiduciaries. It is necessary, however, in certain circumstances, such as where two or more investment alternatives "equally serve the financial interests of a plan" and investing in more than one would entail additional costs—such as "transactional or monitoring costs"—that would "offset the benefits" of selecting multiple investments. 87 Fed. Reg. at 73836. Fiduciaries have relied upon the tiebreaker to select investments in such appropriate situations for at least thirty years; its use is in line with the "settled expectations of fiduciaries." *Id.* And as the

19

Department noted, it is "not aware of plan fiduciaries struggling with the concept of permissible collateral benefits." *Id.* at 73837. Nor did DOL receive any "contrary evidence demonstrating that ERISA's general obligations of prudence are deficient in protecting the interests of plan participants." *Id.* at 73838.

        b.  <u>The plain language of ERISA does not preclude the Department's interpretation.</u>

The plain language of ERISA is consistent with the Rule, and with the Department's decades-long endorsement of the tiebreaker test, including in the 2020 Rule, without challenge. The Rule does not alter fiduciaries' exclusive focus on providing financial benefits to participants, consistent with section 404's plain text, because it permits consideration of the *economic effects* of ESG factors. The tiebreaker likewise does not shift this focus because it is only available where two competing investments stand to financially benefit plan participants equally. *See* 87 Fed. Reg. at 73836. The tiebreaker protects plan participants' interests in their retirement income and assists fiduciaries in a situation that section 404 does not address. *Id.*

As explained, ERISA's duty of loyalty requires fiduciaries to act "solely in the interest of . . . participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries" while "defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1). The Supreme Court in *Fifth Third Bancorp v. Dudenhoffer*, 573 U.S. 409 (2014), held that the term "benefits" in section 404 refers to "*financial* benefits (such as retirement income)" and "does not cover nonpecuniary benefits." *Id.* at 421. Thus, *Dudenhoeffer* confirms that providing financial benefits is ERISA plan fiduciaries' sole purpose. This holding aligns with DOL's longstanding instruction regarding tiebreaker situations and with the Rule at issue here, which restricts the use of the tiebreaker to situations where competing investments "equally serve the financial interests of [a] plan" and emphasizes that fiduciaries may neither "subordinate the interests of participants and beneficiaries in their retirement income," nor "sacrifice investment returns," nor "take on additional

investment risk" in order "to promote benefits or goals unrelated to these interests." 29 C.F.R. §§ 2550.404a–1(c)(1), (2).

Courts also look to the common law of trusts to "inform" (but "not necessarily determine") an interpretation of ERISA's fiduciary duties. *Varity Corp v. Howe*, 516 U.S. 489, 497 (1996). The common law duty of loyalty is consistent with the Rule's exclusive focus on providing benefits to participants and beneficiaries. It requires that a trustee act "solely in the interest of beneficiaries" and "strictly prohibit[s]" trustees from "engaging in transactions that involve self-dealing or that otherwise create a conflict between the trustee's fiduciary duties and personal interests." Restatement (Third) of Trusts § 78(1), (2) (2007). The commentary explains that "social investing" is inconsistent with the duty of loyalty "if the investment activity entails sacrificing the interests of trust beneficiaries—for example, by accepting below market returns—in favor of the interests of persons supposedly benefitted by pursuing the particular social cause." *Id.* § 78, cmt. f (quoting Uniform Prudent Investor Act § 5). The Rule is entirely compatible; it "emphatically addresses potential loyalty breaches by forbidding subordination of participants' financial benefits." *See, e.g.*, 87 Fed. Reg. at 73853.

c.   The Department's reasoned interpretation is entitled to deference.

Under *Chevron v. NRDC*, 476 U.S. 837 (1984), where Congress has not "directly spoken to the precise question at issue," and "the statute is silent," courts move to *Chevron* step two, *id.* at 842–43. At this step, "if the agency action carries the force of law, courts defer to the agency's interpretation of the governing statute," provided that its interpretation is a "permissible construction." *W&T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 234 (5th Cir. 2019) (quoting *Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 392 n.10 (5th Cir. 2014)). Agency action has the force of law where, as here, "Congress delegated authority to the agency generally to make rules carrying the force of law" and the agency interpretation was "promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). In such circumstances, courts "must uphold" the agency action "as long as

21

Case 2:23-cv-00234-PP   Filed 03/28/23   Page 28 of 37   Document 15

it is a permissible construction of the statute"—even if that construction "differs from how the court would have interpreted the statute in the absence of an agency regulation." *Sebelius v. Auburn Reg'l Med. Ctr.*, 568 U.S. 145, 158 (2013) (quoting *NCTA v. Brand X Internet Serv.*, 545 U.S. 967, 980 (2005)).

As explained, ERISA is silent as to what standard fiduciaries should use to guide their investment decisions where two investment courses of action are financially equivalent. The Court should thus defer to the agency's reasonable—and longstanding—use of the tiebreaker standard.

**2.  The Rule Is the Product of Reasoned Decisionmaking.**

Nor are the Department's interpretation of the prudence standard, endorsement of the tiebreaker, removal of novel documentation requirements, or elimination of special restrictions on the selection of QDIAs arbitrary or capricious. Agency action is arbitrary and capricious only where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under this "narrow, highly deferential" standard of review, *Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 425 (7th Cir. 1996), the "court is not to substitute its judgment for that of the agency," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513 (2009). Rather, the agency's decision is presumed valid, and the Court considers only whether it "was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). The Rule meets this deferential standard.

a.  <u>The prudence standard is reasonable.</u>

Plaintiffs contend that the statement that "[r]isk and return factors may include the economic effects of climate change and other [ESG] factors," 29 C.F.R. § 2550.404a–1(b)(4), inappropriately requires fiduciaries to focus on non-financial factors in selecting investments. Mot. 11. They also

appear to argue, based on a citation to one report on ESG investing, that ESG factors are not quantifiable and cannot possibly represent financial superior investment options. *See id.* at 15–16. These arguments misapprehend the plain text of the regulation and ignore the Rule's thorough discussion addressing this topic.

As explained, the Rule clarifies that, where appropriate, a fiduciary "may" consider the "economic effects" of ESG factors as part of an assessment of an investment's financial outlook. Any such consideration would, by definition, be based on the financial value of the investment to the plan, and not on any collateral benefits. *See* 87 Fed. Reg. at 73830–31. Any such decision would also be governed by the duty of prudence. As the Rule explains, it "does not require fiduciaries to consider ESG factors to a different extent than any other factors that the fiduciary reasonably determines are relevant to a risk and return analysis." *Id.* at 73854; *see also id.* at 73831 ("it is not establishing a mandate that ESG factors are relevant under every circumstance"). Fiduciaries may "exercise discretion in determining . . . the relevance of any factor to a risk-return analysis" and "remain[] free . . . to determine that an ESG-focused investment is *not* in fact prudent." *Id.* at 73831. Plaintiffs are thus incorrect to the extent they suggest that the Rule mandates consideration of non-financial factors.

What is more, the Rule includes a lengthy review of literature regarding ESG investments and responds directly to comments concerning whether ESG factors are, in fact, appropriate factors in determining financial performance. *See id.* at 73861–70. DOL concluded that the studies it examined "show that ESG can have a beneficial impact on investing in many circumstances," although "that impact is not universal" and "does not mean that ESG investing will result in improved performance or reduced risk in every circumstance." *Id.* at 73870. At bottom, however, because the consideration of ESG factors is not mandatory, the Department reasonably determined that "fiduciaries will give the same careful consideration to the usefulness and shortcomings of data sources pertaining to ESG

as they do to any relevant data source." *Id.* Plaintiffs' request that the Court second-guess this well-researched expert determination based on a cherry-picked source should be rejected.

>    b.  <u>The tiebreaker provision is reasonable.</u>

Plaintiffs next assert that the Rule's tiebreaker standard—which the Department has supported in some form for three decades—is unreasonable principally because it modifies the language included in the 2020 Rule. *See* Mot. 11. The Department thoroughly explained its reasoning in doing so, including considering relevant factors and assessing multiple alternative courses of action.

As explained, the novel tiebreaker standard in the 2020 Rules—requiring that fiduciaries be "unable to distinguish" among competing investments based on "pecuniary factors alone"—"caus[ed] a great deal of confusion, given that no two investments are the same in each and every respect." 87 Fed. Reg. at 73837. That standard was thus "both impractical and unworkable." *Id.* at 73836. The Rule highlighted public comments emphasizing that this tiebreaker standard "effectively subvert[ed] the fiduciary's best judgment in favor of a standard that is virtually impossible to meet." *Id.* at 73835.

In response to this confusion, the Department considered simply "eliminating the tiebreaker test." *Id.* at 73878. But ultimately it chose to revert to the traditional tiebreaker test. A workable tiebreaker test provides fiduciaries with a solution when they must decide between equally appropriate investments. DOL has long recognized the need for such a solution because, in some cases, diversifying investments among equally strong options might "entail additional costs (such as transactional or monitoring costs) that offset the benefits of investing in two (or more) investments." *Id.* at 73836. Given that ERISA does not address how to make such a choice, the Rule "leave[s] that decision in the hands of fiduciaries." *Id.* Moreover, "some version of the tiebreaker test has appeared in the CFR since 1994," and thus the Rule aligns "with the settled expectations of fiduciaries and others." *Id.* at 73836; *see also id.* at 73878.

The Rule also expressly addresses "concerns that the tiebreaker provision might be subject to

abuse or not be part of a prudent fiduciary process." *Id.* at 73826. It confirms that "fiduciaries utilizing the tiebreaker provision remain subject to ERISA's prudence requirements," as well as "the explicit prohibition against accepting expected reduced returns or greater risks to secure such additional benefits." *Id.* The Rule's safeguarding provisions also prevent abusive or imprudent behavior by plan fiduciaries. These factors "sufficiently protect participants' and beneficiaries' retirement benefits." *Id.*

c. <u>It was reasonable to eliminate the tiebreaker documentation requirement.</u>

Plaintiffs challenge the removal of the 2020 Rules' special documentation requirement for the tiebreaker test, asserting that it is contrary to ERISA's purpose of providing retirees with additional information and could facilitate violations of fiduciary duties. *See* Mot. 11–12, 15–16. But the Department considered these issues and made the reasonable decision to rescind the requirement.

The Department rescinded the requirement because it was "very likely to chill and discourage plan fiduciaries from using the tiebreaker test." 87 Fed. Reg. at 73837–38. The tiebreaker test is useful because it enables plan fiduciaries to carry out their duties under ERISA when deciding between equal competing investments. *See supra* pp. 11–12, 24–25. Imposing a new specific documentation requirement risked discouraging its use and created needless transaction costs on plans. 87 Fed. Reg. at 73871.

Moreover, the Department found that existing duties sufficiently protected plan beneficiaries. The terms of the tiebreaker test itself protect plan participants because it "applies only where competing investments equally serve the financial interests of the plan." *Id.* at 73838. ERISA's duty of prudence renders the documentation requirement "unnecessary" given that "[f]iduciary documentation of their investment activities already is a common practice." *Id.* Indeed, "no commenter provided contrary evidence demonstrating that ERISA's general obligations of prudence are deficient in protecting the interests of plan participants and beneficiaries in this context." *Id.* It was thus harmful to plan participants to mandate documentation that resulted in "increased

transaction costs for no particular benefit to plan participants." *Id.*

For similar reasons, it was appropriate for DOL not to adopt the collateral benefit disclosure requirement that appeared in the NPRM. There was "limited support for the proposed disclosure requirement" in contrast to "substantial concerns with the proposed disclosure requirement." *Id.* at 73839. Commenters' "limited support" focused on general desire for transparency, and was largely conditional on adding additional clarifications and requirements. *Id.* In contrast, commenters' concerns were significant and wide-ranging. Commenters noted ambiguity regarding whether the required disclosure was focused on objective or subjective rationales. *Id.* at 73839–40. Some considered the disclosure requirement unnecessary because it had no economic significance. *Id.* at 73840. Others noted that it could interfere with existing disclosure regulations. *Id.* at 73840. Still others expressed concern that it singled out certain factors and strategies, contrary to the principle of neutrality. *Id.* Many commenters pointed out the possible litigation risk, including inadvertent imposition of a per se breach of disloyalty for violating the requirement. *Id.* at 73840–41.

The Rule ultimately concludes that "a disclosure emphasizing matters collateral to the economics of an investment may not be in the best interests of plan participants." *Id.* at 73880. The Rule reached this conclusion based on commenters' concerns. *Id.* at 73841. It also cited "reasons similar to those underlying the decision to remove the documentation requirements from the" 2020 Rules, *id.*, which the Rule discussed at length, *id.* at 73837–38; *see also supra* pp. 25–26. Finally, the Rule noted that it was monitoring the SEC's ongoing rulemaking on disclosures intended to "allow[] investors to make more informed decisions, including as they compare various ESG investments," and that the Department "may revisit the need for collateral benefit reporting or disclosure depending on the findings of that agency." 87 Fed. Reg. at 73841.

d. It was reasonable to remove the 2020 Rules' specific restrictions on QDIAs.

Plaintiffs also challenge the Department's removal of the 2020 Rules' specific restrictions on QDIAs. Mot. 17–18. Commenters "overwhelmingly" agreed that the specific restrictions on QDIAs were unreasonable. 87 Fed. Reg. at 73842. Rather than protect plan participants, these restrictions "effectively preclude[d] fiduciaries from considering QDIAs that include ESG strategies, even where they were otherwise prudent or economically superior to competing options." *Id.* at 73843. In particular, the restrictions "disallow[ed] a fund to serve as a QDIA if it, or any of its component funds . . . , has investment objectives, goals, or principal investment strategies that include, consider, or indicate the use of non-pecuniary factors in its investment objectives, even if the fund is objectively economically prudent from a risk-return perspective or even best in class." *Id.* Thus, by removing these specific restrictions on what may serve as a QDIA, the Rule actually aligns with Plaintiffs' stated desire that "the most profitable investment . . . should win out"—including if that investment happens to have ESG considerations as one of its goals. *See* Mot. 18. The Rule also explained that while QDIAs do warrant "special treatment," QDIAs maintain sufficient special treatment through the protections of the QDIA regulation. 87 Fed. Reg. at 73843.[6]

**C. A Preliminary Injunction Would Not Serve the Public Interest.**

Finally, granting Plaintiffs' requested injunction would not serve the public interest, and the balancing of the harms strongly favors the government. The Department promulgated the Rule to protect the interests of American workers in their hard-earned retirement savings. A wide range of stakeholders—from "asset managers, labor organizations and other plan sponsors" to "consumer

---

[6] Plaintiffs also assert, briefly, that the Rule violates "the constitutional separation of powers" because DOL allegedly exceeded the statutory authority Congress provided. Mot. 22. The Supreme Court, however, has squarely foreclosed this argument, holding that "claims simply alleging that [the Executive Branch] has exceeded [its] statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994); *see also Ctr. for Bio. Diversity v. Trump*, 453 F. Supp. 3d 11, 53 (D.D.C. 2020) (rejecting, under *Dalton*, attempts to "recast" claims of statutory violations "as constitutional").

groups, service providers, and investment advisors"—expressed concern about the potential negative impacts of the 2020 Rules. 87 Fed. Reg. at 73825–26. By "appearing to single out ESG investing for heightened scrutiny," the 2020 Rules "ha[d] been interpreted as putting a thumb on the scale against the consideration of ESG factors, even when those factors are financially material." *Id.* at 73826; *see also, e.g., id.* at 73854. ERISA fiduciaries, however, must be able to consider *all* potentially financially material factors when selecting investments. *See id.* at 73826 Any action that discourages consideration of the economic effects of climate change or other ESG factors could inappropriately disadvantage ERISA plans by "deterring fiduciaries from taking steps that other marketplace investors would take in enhancing investment value and performance, or improving investment portfolio resilience against the potential financial risks and impacts" of climate change or other ESG factors. *Id.* Because the Rule removes the perceived thumb on the scale against consideration of ESG factors and clarifies that fiduciaries' investment decisions must be based on any factors relevant to a risk and return analysis, the Rule is in the interest of ERISA participants and beneficiaries, and the public at large.

Moreover, the Rule reaffirms standards that ERISA fiduciaries have relied upon for years in making investment decisions. *See id.* at 73878, 73879. By altering certain of those standards and utilizing new language found nowhere in ERISA, the 2020 Rules sowed confusion and risked creating a chilling effect on appropriate investment activity. *See id.* at 73825–26. Dissipating this confusion and providing proper standards to govern ERISA fiduciaries' actions, consistent with their settled expectations, is also in the public interest.

Plaintiffs point only to their merits arguments to assert that the public interest favors an injunction. Mot. 28 (pointing to "potential investment losses," "the inability to hold imprudent actors accountable," and allowing fiduciaries to pursue "other motivations"). Because those arguments fail, the balance of harms weighs against Plaintiffs.

## II. Any Relief Granted Should Be Appropriately Limited.

Should the Court see fit to grant any portion of Plaintiffs' requested injunction—which it should not—any remedy should be appropriately limited. *First*, if the Court were to determine that any portion of the Rule is invalid as to any Plaintiff, it should give effect to its severability clause, *see* 87 Fed. Reg. at 73886, and tailor any relief narrowly to allow the remainder of the Rule to remain in effect. *See, e.g.*, *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1033 (5th Cir. 2019); *Am. Fed'n of Lab. & Cong. of Indus. Org. v. Chao*, 409 F.3d 377, 391 (D.C. Cir. 2005).

*Second*, any relief should apply only to the named Plaintiffs. Because a federal court's "constitutionally prescribed role is to vindicate the individual rights of the people appearing before it," "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1933–34 (2018). When a court orders "the government to take (or not take) some action with respect to those who are strangers to the suit, it is hard to see how the court could still be acting in the judicial role of resolving cases and controversies." *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring). Plaintiffs' sole cited case in support of a nationwide injunction underscores this point. *See* Mot. 25 (citing *City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020)). In *Barr*, the Seventh Circuit cautioned that nationwide injunctions "present real dangers, and will be appropriate only in rare circumstances." 961 F.3d at 916. The Court concluded that a nationwide injunction was not necessary to provide complete relief to the plaintiffs. *Id.* at 921. *Barr* thus confirms that, where possible, courts should craft remedies as narrowly tailored as possible to provide complete relief to plaintiffs.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order and a preliminary injunction should be denied. At a minimum, any relief granted should apply only to any portion of the Rule found invalid, and only to Plaintiffs.

Dated: March 28, 2023

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

BRAD P. ROSENBERG
*Special Counsel*
Federal Programs Branch

/s/ *Leslie Cooper Vigen*
LESLIE COOPER VIGEN
*Senior Trial Counsel*
CASSANDRA M. SNYDER
*Trial Attorney*
U.S. Department of Justice
Civil Division
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 305-0727
leslie.vigen@usdoj.gov

*Counsel for Defendant*